02-cv-4157        ORIGINAL

<u>Exhibits</u>

P1, P37, P38, P39, P46, P479, P51, P52 & P53

ORIGINAL

PROSE OFFICIAL

Exh. P 1

CV 02 4157

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BLOCK, J.

BLOOM, M.J

-------------------------------------------x

PATRICK F. D'CUNHA

Plaintiff,

-against-

GENOVESE/ECKERD CORPORATION.

Defendant(s).

**COMPLAINT**

JURY TRIAL DEMANDED
☑ YES
☐ NO

This action is brought for discrimination in employment pursuant to (check only those that apply):

☐ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Publ. L. No. 102-166) (race, color, gender, religion, national origin).

**Note:** In order to bring suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.

☑ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634 (amended in 1984, 1990, and by the Age Discrimination in Employment Amendments of 1986, Pub. L. No. 99-592, the Civil Rights Act of 1991, Pub. L. No. 102-166).

**Note:** In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.

☐ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112-12117 (amended by the Civil Rights Act of 1991, Pub. L. No. 102-166).

**Note:** In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.

Plaintiff's Exh. 1. (P1)

30

**JURISDICTION**

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343. Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law. Within 90 days of the commencement of this action, the Equal Employment Opportunity Commission (EEOC) issued a right to sue letter.

**PARTIES**

1. Plaintiff resides at: ___137-22 LABURNUM AVENUE, FLUSHING, NY.___
   Street Address                                     City

   ___QUEENS,___          ___N.Y. 11355 (718) 661 2979___
   County                          State            Telephone Number

2. Defendant(s) reside(s) at, or its business is located at: ___Mr. WAYNE HARRIS CEO___.

   ___8333   BRYAN   DAIRY ROAD, LARGO, ~~FLORIDA~~___
   Street Address                                     City

   ___PINELLAS___          ___FLORIDA   (727) 395 6000___
   County                          State            Telephone Number

3. The address at which I sought employment or was employed by the defendant(s) is:

   ___75-75  31st AVE.  JACKSON HEIGHTS , NY.___
   Street Address                                     City

   ___QUEENS___          ___NEW YORK. 11370___
   County                          State

Note: I was interviewed at this place for a ~~possible~~ position as a Pharmacist in NEW JERSEY, and this was very clear from the interview with Mr. Mr. Dolan – Regional Recruiter for N.J. (for ECKERD) corp. The Interview with Mr. Dolan was taped I was told, hence can be retrieved.

P1-2                                               31

4. The discriminatory conduct of which I complain in this action includes (check only those that apply):

☑ Failure to hire me.

❑ Termination of my employment.

❑ Failure to promote me.

❑ Failure to accommodate my disability.

❑ Unequal terms and conditions of my employment.

❑ Retaliation.

❑ Other acts (specify): _____

   **Note:** Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.

5. It is my best recollection that the alleged discriminatory acts occurred on: ___   _____

   Date

6. I believe that defendant(s)   (check one)

☑ is still committing these acts against me.

❑ is not still committing these acts against me.

7. Defendant(s) discriminated against me based on my:   (check only those that apply and explain)

___ Race _____        ___ Color _____

___ Gender/Sex _____        ___ Religion _____

___ National Origin _____

✓ Age  50        My date of birth is:  0 2 / 2 1 / 1952

___ Disability _____

   **Note:** Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.

P1·3

32

8. The facts of my case are as follows: Please refer to the entire 4 pages of the charge I filed with EEOC along with (6) six pages of items of evidence mentioned in the charge.

_____

_____

_____

_____

_____

_____

_____

(Attach additional sheets as necessary)

**Note:** As additional support for the facts of your claim, you may attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.

9. It is my best recollection that I filed a charge with the New York State Division of Human Rights or the New York City Commission on Human Rights regarding defendant's alleged discriminatory conduct on: _04/03/02_ .
                                                                              Date

10. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct on:
_04/03/02_ .
       Date

**Only Litigants Alleging Age Discrimination Must Answer Question #11.**

11. Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct (check one),

☑  60 days or more have elapsed.

☐  less than 60 days have elapsed.

P1-4

33

12. The Equal Employment Opportunity Commission (check one):

☐   <u>has not</u> issued a Right to Sue Letter.

☑   <u>has</u> issued a Right to Sue Letter, which I
received on   _May 03/2002_ .

**Note:** Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity Commission to this complaint.

WHEREFORE, Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, costs and attorney's fees.

Dated: _07/23/02_

_Patrick F. D'Cunha._
**Plaintiff's Signature**

_137-22 LABURNUM AVE.,_
**Address**  _FLUSHING, NY  11355 ._

_(718) 661 2979_
**Telephone Number**

_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_
**Social Security Number**

P1.5

/ 34

☑ EEOC    160-A2 01077

and EEOC

State or local Agency, if any

[E]Indicate (Mr), Ms., Mrs.)

PATRICK F. D'CUNHA

HOME TELEPHONE (Include Area Code)
718-661-2979

[STR]EET ADDRESS    CITY, STATE AND ZIP CODE
137-22 LABURNUM AVENUE, FLUSHING, NY 11355

DATE OF BIRTH
02/21/1952

[NAM]ED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT [AGE]NCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

[NAM]E Mr. JIMMY TRAN
ECKERD CORPORATION
District Pharmacy Supervisor

NUMBER OF EMPLOYEES, MEMBERS
More than 8000 Pharmacists

TELEPHONE (Include Area Code)
917-295 0473

[STR]EET ADDRESS    GENOVESE    CITY, STATE AND ZIP CODE
5-75 31st AVENUE JACKSON HEIGHTS, NY 11370

COUNTY
QUEENS

[NAM]E Mr. WAYNE HARRIS, CEO
ECKERD CORPORATION

TELEPHONE NUMBER (Include Area Code)
727 395 6000

[STR]EET ADDRESS    CITY, STATE AND ZIP CODE
7333 BRYAN DAIRY ROAD, LARGO, FLORIDA 33777

COUNTY
PINELLAS

[CAU]SE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[ ] RETALIATION  [✓] AGE  [ ] DISABILITY  [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST    LATEST
08/28/2001    02/19/2002

[ ] CONTINUING ACTION

[THE] PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

SEE ATTACHED

DATE RECEIVED    APR 1 2002    EMPLOYMENT OPPORTUNITY COMMISSION NEW YORK DISTRICT OFFICE INTAKE UNIT

(A) FOUR (4) pages of the particulars of the charge.

(B) SIX (6) items of evidence as mentioned in the charge.

Please note: In item #6, the letter dated January 23/95, In the last paragraph at the bottom, I had circled the year, since there was an error in the exact date; the correction was made after the letter was mailed.

[I w]ant this charge filed with both the EEOC and the State or local Agency, [if a]ny. I will advise the agencies if I change my address or telephone [num]ber and I will cooperate fully with them in the processing of my [char]ge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

[I de]clare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT
Patrick F. D'Cunha

4/03/02 Patrick F. D'Cunha.
Charging Party (Signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)
03/04/2002

[EEO]C FORM 5 (REV. 3/01)

CHERYL IRWIN JANE
Notary Public, State of New York
No. 01CH6012510
Qualified in New York County
Commission Expires Aug. 31, 200_

P1-7    35    DEF-40

EEOC Form 161 (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: Mr. Patrick D'Cunha
137-22 LaBurnum Avenue
Flushing, NY 11355

From:
Equal Employment Opportunity Commission
New York District Office
201 Varick Street, Room 1009
New York, New York 10014

[ ] *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 160-A2-01074 | Legal Unit | (212) 741-8815 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]   We cannot investigate your charge because it was not filed within the time limit required by law.

[ ]   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]   While reasonable efforts were made to locate you, we were not able to do so.

[ ]   You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ x ]   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]   Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u>** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

On behalf of the Commission

Spencer H. Lewis, Jr., District Director

4/30/02
*(Date Mailed)*

Enclosure(s)

cc:   Respondent: Genovese/Eckerd Corporation

P1·6

THE PARTICULARS ARE :

8 (a)

On August 28/2001, When Mr. Jimmy Tran- **ECKERD CORPORATION'S District Supervisor for North & Central New Jersey DENIED ME A JOB OFFER , FOR A POSITION AS A PHARMACIST IN NEW JERSEY, BOTH HE AND THE ECKERD CORPORATION DISCRIMINATED AGAINST ME ON THE BASIS OF MY AGE. The incident took place at GENOVESE PHARMACY (a subsidiary of ECKERD CORPORATION ) at 75-75 31st Avenue , Jackson Heights, New York 11370, where Mr. Tran personally interviewed me.**

8 (b)

Earlier , I was already interviewed by Ms. Jenifer Dolan ( ECKERD CORPORATION'S Regional Pharmacy Recruiter for North and Central New Jersey) on August 1st, 2001, for 45 minutes.This interview was over the phone, as Ms. Dolan was not able to come to the previously scheduled location . Ms. Dolan was quite satisfied with the interview and the interview itself was taped I was told. I wrote some of the questions I was asked and the answers I gave. After the interview, Ms. Dolan told me, I would hear from Mr. Tran in a day or two. **I believed , since the Regional Recruiter of ECKERD CORPORATION had recruited me, I had the job, because that's what recruiters do, do they not? I asked Ms. Dolan what I should do if I did not hear from Mr.Tran, she told me then we will have to see what happened** ( words to that effect). I did not hear from Mr. Tran till 08/09/01 , hence I called Ms. Dolan and asked her what she had decided regarding me ? On 08/22/01 Ms.Dolan called me and told me I should hear from Mr. Tran by August 27, and if I did not , then I could call Mr. Tran at 917-295 0473.

8 (c)

Finally , I was also interviewed by Mr. Tran on 08/28/2001 at the GENOVESE PHARMACY mentioned above. Mr.Tran asked me to fill up an application form in which I indicated MY WILLINGNESS TO WORK ANY SHIFT, WORK ALL WEEKENDS, DO FLEX TIME ( 12 Hr. shift) AND ALSO READINESS TO RELOCATE IF NEEDED. Mr. Tran spent a lot of time, trying to tell me how demanding the job of a Pharmacist is, and further, he told me that sometimes he calls his pharmacists early morning and asks them to report to work, and my response was : " That's perfectly fine with me." Mr. TRAN ASKED ME WHY I DID NOT GET MY LICENSE IN NEW YORK AND THAT I SHOULD TRY TO GET MY LICENSE IN NEW YORK. I WAS AMAZED AT THIS SUGGESTION.

8 (d)

The thank you letter I sent to Mr.Tran, came back **because the office address Mr Tran gave me ( Mr Tran did not have his business card with him ) was wrong. I do have the envelope and the return receipt of that letter, with remarks from the post office.** Several calls I made to Mr. Tran were not returned. I was not informed - neither by phone nor by a letter - whether I got the job or did not. To me this behavior sent a clear message , " ECKERD DOES NOT NEED YOUR SERVICES AND DOES NOT HAVE TIME TO LET YOU KNOW WHY YOU DON'T DESERVE THIS JOB." This is absolute disregard to my humanity and I think no human being should ever be treated this way.

8 (e)

On 02/12/2002 I called Ms. Dolan the Regional Recruiter , and told her that I believed I WAS A VICTIM OF AGE DISCRIMINATION BY ECKERD CORPORATION ,

P1.8

37

8(e)

AND WAS CONSIDERING FILING A CHARGE OF DISCRIMINATION. Ms. Dolan asked me to wait until she got back to me on the issue, which she did. Ms. Dolan asked me to meet Mr. Tran and Mr.John Bowls-District Supervisor and also superior of Mr. Tran ( I was told ) at ECKERD DRUGS at WALDWICK, NEW JERSEY ON 02/19/2002 IN ORDER TO RESOLVE THIS ISSUE. When I requested Ms.Dolan for another possibly closer location, she told me that I would be working in New Jersey so better get used to it ( words to that effect). I told Ms.Dolan that I believe I do not need to submit my Résumé again ( meaning that this was not another interview, rather a meeting to resolve the INJUSTICE OF AGE DISCRIMINATION THAT TOOK PLACE IN AUGUST 2001) and Ms. Dolan told me that I did not have to submit the Résumé again. Ms. Dolan also asked me to let her know what happened at the Waldwick meeting.

8(f)

At that meeting , only Mr.Tran was present , Mr. John Bowls did not come. At first Mr. Tran said that he had never seen me before, but later admitted that he did meet me, but he still denied that it was more than five months ago. **When I asked Mr.Tran how come he does not remember having interviewed me ? Mr. Tran said , " I interview millions of people , it's difficult to remember everyone."** Mr. Tran asked me to fill an application but I requested him that the application I filled on August 28/2001 be processed instead. Then suddenly Mr. Tran said that he did not have an opening under his jurisdiction at the moment . Just like he did at the interview at GENOVESE - Jackson Heights Mr. TRAN once again made the remark , " WHY DON'T YOU GET NEW YORK LICENSE ?" I COULD NOT UNDERSTAND WHY HE WAS MAKING SUCH REMARKS EXCEPT TO TELL ME THAT I WOULD NOT BE OFFERED A JOB IN NEW JERSEY NO MATTER WHAT. I had come to Waldwick New Jersey , by taking one bus, two subway trains ( # 7 & F ) , Path train and another New Jersey Transit train (BERGEN COUNTY LINE ) ABOUT 2 HOURS AND 15 MINUTES EACH WAY. I WAS WILLING TO DO THIS TRAVEL EACH DAY OF MY LIFE AS LONG AS I WORKED FOR ECKERD CORPORATION, IF I WAS OFFERED A JOB. ONCE AGAIN I WAS DENIED A JOB OFFER, <u>ONLY BECAUSE OF MY AGE.</u>

8(g)

**Mr. Tran asked me if I was willing to work upstate New Jersey at a pharmacy in Sussex and I said yes,** he then spoke to the District Supervisor in that area and told me that it would be difficult for me to get there and that **there is no transportation to that area except for a car , but when I asked him to give me the exact location with a cross street Mr. Tran did not do so for reasons I do not understand.** I told Mr. Tran that I was willing to relocate and he told me that I would not qualify for the relocation package because it is my need to come to New Jersey for work. Mr. Tran told me about some lady pharmacist from New York who faced the same situation. Mr.Tran then told me that he would first contact the District supervisor for Jersey City because there may be a position available there. Mr. Tran called the District Supervisor for Jersey City ( I was told) Mr. George Kowaski. In his conversation he said these words , " **Sounds like a plan to me .**" Mr. Tran let me speak with Mr. Kowaski who told me that he had 2 ( two ) positions to be filled, and that he would call me either the same day or the next day. Mr. Tran also gave me Mr. Kowaski's telephone # 609 947 4627 , and he told me to call Mr. Kowaski if I did not hear from him.

8(h)

Additional details of the Waldwick meeting : 1) **Mr. Tran TOLD ME THAT HE DID**

P 1-9                    38

8(h)

NOT DISCRIMINATE AGAINST ME AFTER THE AUGUST 2001 INTERVIEW. I ASKED HIM TO GIVE ME ONE REASON WHY I WAS DENIED A JOB OFFER AFTER THE 08/28/2001 INTERVIEW ? Mr. TRAN HAD NO ANSWER TO THIS QUESTION. 2) I ALSO SHOWED Mr. Tran AN ARTICLE FROM PHARMACY TODAY WHICH SHOWED 22% SHORTAGE OF PHARMACISTS NATIONWIDE, AND I SAID THAT THE SHORTAGE IS PROBABLY HIGHER FOR NEW JERSEY AND NEW YORK AND YET YOU DENY PHARMACISTS LIKE ME, AN OPPORTUNITY TO WORK, WHY? Mr. Tran's REPLY WAS SHOCKING. HE SAID, " JUST BECAUSE THERE IS A SHORTAGE, DOES NOT MEAN THAT WE HIRE ANYBODY." I ASKED Mr. TRAN, IF HE MEANT THAT THE PHARMACISTS LICENSED IN THE UNITED STATES WERE SUBSTANDARD IN ANY WAY WHATSOEVER? ONCE AGAIN Mr. Tran HAD NO ANSWER. 3) Mr. Tran when he spoke to each of the two District Supervisors , he said, " I have a Pharmacist here whom I interviewed two months ago, ... ." I immediately corrected him that he had interviewed me more than five months ago but he ignored me.

8(i)

THE OUTCOME OF THIS MEETING AT ECKERD DRUGS , WALDWICK, NEW JERSEY WAS : NO RESOLUTION OF THE AGE DISCRIMINATION THAT TOOK PLACE ON 08/28/2001. Ms. Dolan's purpose of setting up this meeting was totally defeated , and IT TURNED OUT TO BE A CRUEL JOKE PLAYED ON ME, BY ECKERD CORPORATION OFFICERS ( ESPECIALLY by Mr. Tran) WHO HAVE THE AUTHORITY TO MAKE IMPORTANT DECISIONS ABOUT LIVES OF PROSPECTIVE EMPLOYEES LIKE ME.

8(j)

DENYING PHARMACISTS A JOB OPPORTUNITY BECAUSE OF THEIR AGE, IS VERY MUCH AGAINST THE PHILOSOPHY OF ECKERD CORPORATION, AND I BELIEVE ECKERD CORPORATION WILL CORRECT THIS MISTAKE NOT JUST FOR MY SAKE BUT FOR ALL THE OTHER PHARMACISTS AND EMPLOYEES, WHO ARE OTHERWISE VERY WELL QUALIFIED.

8(k)

NB : There are more things related to this Charge of Discrimination I am filing, that I did not include here even though they may be important, because I want to make this statement concise, however I would like to share those instances with the investigator of this case when I am given an opportunity to do so.

8(l)

Encl.: 1. Thank You letter to Ms. Dolan ( dated August 02/2001 )
     2. Thank You letter to Mr. Tran that was returned to me ( dated August 29/2001)
     3. " Dear Licensed New Jersey Pharmacist ," letter I received from ECKERD CORPORATION ( dated June 2001) which I received last week of July.
     4. Copy of a page from Pharmacy Today ( dated July 2001 ) showing Vacancy rates for selected positions
     5. ECKERD CORPORATION'S Classified AD in July, 2001 issue of Pharmacy Today
     6. A letter addressed to the then Director of Pharmacy , GENOVESE Drug Stores , Inc. ( dated January 23, 1995 ). The date is correct and there is no typing error here. I will explain the details about this letter to the investigator(s).

P1·10         39

8(m)

I submit these documents as evidence in this case. I further request the Federal and /or State investigator(s) to also get the records of all the phone calls from me to the ECKERD Corporation officers mentioned above and vice versa ( especially the calls from Ms. Dolan to me, which reveal the nature of what this case is about ). In my Interview with Ms. Dolan, I had mentioned the fact that I was initially denied admission to St. John's University but when I wrote a letter challenging the basis of this decision, I did finally get admission to St. John's University and completed the 5 year   B. Pharm degree, in a little over 3 years. I could submit that letter if it may be related to this case and the way I have been treated thereafter.

8(n)

I REQUEST THAT MY WIFE , Agnes D'Cunha's testimony be taken , as a person who has seen me go through a horrendous agony as a result of this ongoing discrimination. In this context I want to mention that in the taped interview when I explained to Ms. Dolan why I did not work until now, the answer I gave to Ms. Dolan ( I believed ) was totally true at that time, but when in first week of March , 2002, I found the January 23 / 1995 letter , all my suppressed past came back to me and I realized the other half of the story is a series of acts of discriminations against me mostly in 1995 , which may have involved AGE, COLOR, NATIONALITY, ETHNICITY AND / OR RETALIATION, ONE OR MORE OF THESE AT A TIME. Each time I was victimized, I felt an inner pain no one could possibly understand, I felt these powerful institutions were trying to destroy my soul , they were trying to take away my dignity as a human being. Unfortunately these acts of discrimination against me may have begun with GENOVESE Drug Store, Inc. denying me even an interview, after that covering letter I sent ( with my Résumé ) in January 1995. WHY ?

8(o)

I TRUST IN THE AMERICAN SYSTEM OF JUSTICE AND EQUAL OPPORTUNITY AND I KNOW THE SYSTEM WILL NOT LET ME DOWN.

P1-11                    40

PATRICK F. D'CUN
134-38 MAPLE AVE.; #
FLUSHING, NY 11355
(718) 961-5717

August 2, 2001

ECKERD CORPORATION
Attention : Ms. JENIFER DOLAN
Pharmacy Recruiter for North and Central New Jersey
Route 413, Summit Square Shopping Center
PENNSYLVANIA 19047

Dear Ms. Dolan:

   Thank you for your time and attention during my interview with you yesterday. I appreciated the opportunity to discuss my qualifications and aspirations with you.

   I hope that all questions were answered to your satisfaction, but I would be happy to supply any further information you may need.

   I was particularly impressed with performance based promotions policy ECKERD CORPORATION offers for pharmacists.

   I am very interested in the growth potential of the position we discussed.

   Thank you for granting me an interview. I look forward to hearing from you in the near future.

Sincerely,

*Patrick F. D'Cunha*

Patrick F. D'Cunha

---

**Postal Form PS Form 3800, January 2001**

Postage $ 0.34
Certified Fee 2.10
Return Receipt Fee (Endorsement Required) 1.50
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees $ 3.94

UNIT ID: 0002
Postmark Here
Clerk: KTVXJT
08/02/01

Sent To ECKERD CORPORATION
Attention: Ms. Jenifer Dolan — Central
Street, Apt. No.; or PO Box No. Pharmacy Recruiter for Norbern
Route 413, Summit Square Shopping
City, State, ZIP+4 PENNSYLVANIA 19047.

PS Form 3800, January 2001      See Reverse for Instructions

---

**PS Form 3811, March 2001 — Domestic Return Receipt**

SENDER: COMPLETE THIS SECTION
■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
ECKERD CORPORATION
Attn. Ms. Jenifer Dolan
Pharmacy Recruiter North & Central NJ
Route 413, Summit Square Shopping Center
PENNSYLVANIA 19047.

41

P1:12

COMPLETE THIS SECTION ON DELIVERY
A. Received by (Please Print Clearly)     B. Date of Delivery 8/4
C. Signature X ___ ☐ Agent ☐ Address
D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchan
☐ Insured Mail     ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label) 7001 0360 0002 7258 6016

PS Form 3811, March 2001      Domestic Return Receipt

PATRICK F. D'CU
134-38 MAPLE AVE.; #
FLUSHING, NY 11355
(718) 961-5717

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ 0.34 |
| Certified Fee | 2.10 |
| Return Receipt Fee (Endorsement Required) | 1.50 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.94 |

08/29/01

Sent To ECKERD CORPORATION
Attn: Mr. Jimmy TRAN
Street, Apt. No.; District Manager
or PO Box No. 80 Market Avenue
City, State, ZIP+4 Melville, NY 11747 -

PS Form 3800, January 2001          See Reverse for Instructi

August 29, 2001

ECKERD CORPORATION
Attention: Mr. JIMMY TRAN
DISTRICT MANAGER
80 Market Avenue,
Melville, New York 11747

Dear Mr. Tran:

Thank you for your time and attention during my interview with you yesterday. I appreciated the opportunity to discuss my qualifications and aspirations with you.

I hope all questions were answered to your satisfaction, but I would be happy to supply any further information you may need.

Once again I want to mention that I will be totally available to work both weekends , I am also open to 12- hour flex duty.

If I am given an opportunity to serve ECKERD CORPORATION, I will put all my energies into doing the best job I can, I will serve the Corporation with total dedication and maximum efficiency. I believe Eckerd Corporation is a great company to grow with and a great company to stay with.

Thank you for granting me an interview. I look forward to hearing from you in the near future.

Sincerely,

Patrick F. D'Cunha



TRICK F-D'CUNHA
-38 MAPLE AVE. #1B
USHING, NY 1135

**CERTIFIED MAIL**

7001 0360 0002 7238 6854

REASON CHECKED
Unclaimed        Refused
Attempted Not known
Insufficient Address
No such street, number.
No such office in state
Do not remail in this envelope

QUEENS NY
PM
2001
9264

11747

42

PI-13  RETURN RECEIPT REQUESTED

ECKERD CORPORATION
Attention: Mr. Jimmy Tran
District Manager
80 Market Avenue,
Melville, New York 11747.



Licensed New Jersey Pharmacist,

a licensed Pharmacist, you know your skills are in demand right The demand for licensed Pharmacists is growing s the population of America ages and doctors increasingly rescribe medication therapies to help their atients live longer, healthier lives.

With your profession in a growth mode, this is the perfect me to join the Eckerd team. We are a great company to row with, and a great company to stay with. With ver 140 stores in New Jersey and 2,650 stores ocated along the Eastern Seaboard and Gulf Coast tates, Eckerd offers you opportunities for today and omorrow – wherever your plans take you!

We are currently offering *signing bonuses* (depending n location) for Pharmacists licensed to practice in he state of New Jersey, and that's just for starters. We also provide our Pharmacists with a comprehensive package of benefits which includes:

- *A salary competitive with any major drugstore chain operating in New Jersey.*
- *Paid vacations, holidays and personal days.*
- *Fully-paid pension and 401(K) retirement plans.*
- *40-hour workweek for full-time, salaried pharmacists, with paid lunch breaks (where allowable by law).*
- *Health coverage options with leading insurers and HMO's in the state.*
- *20% Eckerd Associate discount, and 20% JCPenney discount.*
- *An efficient workplace environment, with a trained support staff.*
- *ACPE-approved continuing education courses.*
- *Relocation packages for newly-hired Pharmacists (depending on location).*
- *PharmD loan program.*

Eckerd allows you to go to the horizon of your abilities and ambitions, whether you choose to practice in a community pharmacy for the life of your career, explore the possibilities in clinical and on-line services, or advance into pharmacy or corporate management. Whatever your expectations in your career as a Pharmacist, Eckerd offers the paths to achieving your professional, financial and personal goals.

invite you to take a look at Eckerd, because I think you'll like what you see, in the people we employ, the ocations of our pharmacies, and in the kind of company we are. Like your profession, we're growing strong. Let's grow together!

Sincerely,

*Kandyce J. Daley*

Kandyce Daley, R.Ph.
Pharmacy Services Manager
Eckerd Corporation

P1-14

43

*For information regarding career opportunities as an Eckerd Pharmacist, contact a regional Pharmacy Recruiter today:*

**North and Central New Jersey**
Jenifer Dolan
(888) 352-6383 ext. 2312
(215) 997-0251
Jdola3@eckerd.com

**South New Jersey**
Shawna Bates
(888) 352-6383 ext. 2198
(804) 768-1579
Sbates@eckerd.com



An official publication of the American Pharmaceutical Association

# PHARMACY TODAY

® APhA

**THE PROFESSION'S NEWS & OPINION LEADER**

Volume 7 • Number
JULY 2001

## One in five hospital pharmacist slots unfilled

**Vacancy rates for selected positions**



21%   18% 18%   12%   11%

Pharmacists · Radiological Technologists · Billing/Coders · Laboratory Technologists · Registered Nurses

Source: American Hospital Association Workforce Survey, June 2001. Survey of 715 hospitals

## bulletin

- **A third pharmacy's new home on the Web is ...** Pharmacist.com. The new joint APhA and National Association of Boards of Pharmacy (NABP) Web site will debut soon. Pharmacists will have access to breaking pharmacy news, continuing education services, comprehensive drug information resources, an online store for purchasing reference books and registering for live educational programs, a career center, online practice tests for NABP-produced competency exams, and a relicensing facility to allow pharmacists to renew their licenses with their state boards. Also, www.aphanet.org, APhA's current site, will be upgraded.

- **Pharmacy Education Aid Act of 2001:** A first step in addressing the pharmacist shortage was taken last month when Reps. James P. McGovern (D-Mass.) and Mike Simpson (R-Idaho) introduced legislation that provides fund-

## Compensation for pharmacists' patient care services proposed in new bill

Latest Medicare reform plan recognizes pharmacists as providers

APhA is one step closer to fulfilling its goal of securing pharmacists' eligibility for Medicare reimbursement with Sen. Tim Johnson's (D-S. Dak.) introduction of the Medicare Pharmacist Services Act of 2001 (S. 974). Association staff and leaders from other national pharmacy organizations worked closely with Johnson to craft the legislative language.

"This legislation would amend Medicare to recognize pharmacists as health care providers and make available drug therapy management services to beneficiaries. These services, which are provided in collaboration with physicians and other health care professionals, help patients make the best use of medications,"

Johnson

Johnson said. "Access to pharmacists' collaborative drug therapy management services is particularly important now while many Medicare beneficiaries struggle to pay out-of-pocket for their prescription medications and as Congress looks to design a comprehensive and affordable prescription drug benefit for the future."

APhA Executive Vice President John A. Gans, PharmD, applauded Johnson's bill and indicated that it has the potential to shape the future of the pharmacy profession.

"The introduction of S. 974 is a landmark event in our profession's journey as providers of quality health care," Gans said. "The work of several pharmacy leaders, especially APhA member Brian Kautz, who worked in Sen. Johnson's office and helped communicate the value of pharmacists' services, demonstrates the power of grassroots leadership in moving our agenda forward."

Kautz, professor and head of the department of clinical pharmacy at the South

Medicare continued on page 12

P1-15

44

# PHARMACISTS ARE THE FOUNDATION OF OUR COMPANY. AND WE CAN BE THE FOUNDATION OF YOUR FUTURE.

Our founder, J. Milton Eckerd, opened the very first Eckerd drugstore more than a century ago. And through service to four generations of American families, the more than 8,000 pharmacists we employ today are still the foundation of our company. Eckerd Corporation is committed to the practice of pharmacy. And we are committed to providing our pharmacists with both the resources to practice their profession and the rewards for maintaining our standard of excellence. As you consider the options for a career in pharmacy, consider Eckerd Corporation. A company with a long tradition of caring. A company with a solid foundation for your future.

- **The nation's 4th largest drugstore chain, with more than 2,600 locations in 20 Sunbelt and Northeast states**
- **Sign-on bonus (depending on location) and relocation packages for newly-hired pharmacists**
- **Paid lunch breaks (where allowed by state law)**
- **Fully-paid pension plan and 401 (k) program**
- **ACPE approved continuing education courses online**
- **PharmD loan**
- **Health and dental programs and vision discount plan**

Eckerd, headquartered in Largo, FL, is extremely interested in continuing our strong relationship with Pharmacy Students. We offer exciting undergraduate and graduate internships as well as a Student Financial Assistance Program. Eckerd also sponsors annual Pharmacy Review Courses to prepare recent Pharmacy graduates for the state licensure exam.
Please visit with our regional recruiters at the University of Houston's career and interview days or learn more about pharmacy career opportunities at Eckerd by calling (888) 352-6383 or emailing us at careers@eckerd.com. Eckerd is an equal opportunity employer.



ECKERD®

4.5

P1-16

134-38 Maple Ave., # 1B

Flushing, NY 11355

January 23, 1995

Director of Pharmacy Operations

Genovese Drug Stores, Inc.

80 Marcus Drive

Melville, N.Y. 11747

Dear Sir/Ms. :

I am forwarding my resume in response to your January 15, 1995 advertisement in The New York Times for the graduate Pharmacy Intern position with Genovese.

I am a graduate of St. John's University with a B.S. in Pharmacy. After the January licensing examinations, I hope to be licensed as a Registered Pharmacist in the state of New York by April 1995. As you will see from my resume, I have six months experience of working full time in Elmhurst Hospital Unit Dose Pharmacy. I worked as a full time graduate Intern in the evening shift, including all weekends. This experience has enhanced my confidence to be an effective Pharmacist in today's environment of greater patient care needs than ever before; needs that require quality service and professional courtesy.

I would greatly appreciate the opportunity to discuss with you how I can contribute to the ongoing success of Genovese.

Thank you for your consideration. I lok forward to hearing from you.

Sincerely,

Patrick F. D'Cunha.

Patrick F. D'Cunha

46

Encl.

NB: I just learned that Genovese has stores in New Jersey. So I want to let you know I received my R.Ph. license in New Jersey in September 1994 and would be willing to work as an R.Ph. in Bergen county if offered a position. I am willing to relocate. Thank you. Patrick F. D'Cunha.

P1-17

## [Certified Mail Receipt]

Complete items 1 and/or 2 for additional services.

Complete items 3, and 4a & b.

Print your name and address on the reverse of this form so that we can return this card to you.

Attach this form to the front of the mailpiece, or on the back if space does not permit.

Write "Return Receipt Requested" on the mailpiece below the article number.

The Return Receipt will show to whom the article was delivered and the date delivered.

☐ Addressee's Address

2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

GENOVESE DRUG Stores, Inc.

Attn: PHARMACY OPERATIONS

80 MARCUS DRIVE

Melville NY 11747

4a. Article Number

Z 438509 135

4b. Service Type

☐ Registered    ☐ Insured

☒ Certified    ☐ COD

☐ Express Mail    ☐ Return Receipt for Merchandise

7. Date of Delivery

5. Signature (Addressee)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature (Agent)

PS Form 3811, December 1991    ☆U.S. GPO: 1993–352-714    DOMESTIC RETURN R

JAN 27 1995

*Walgreens*

P37

October 26, 2005

Re: Patrick D'Cunha

To Whom It May Concern:

This letter is verification that Patrick D'Cunha was employed as a Registered Pharmacist by Walgreen Co. from June 18, 2005 through October 11, 2005. According to our records, Mr. D'Cunha was discharged for substandard work performance.

If you have any questions, please call me at (847) 914-8025

Sincerely,

Rose Wszolek
Personnel Records Administrator

Plaintiff's Ex. 37.

FORM 276 (REV. 3/89) L C. 961801

# DISCIPLINARY RECORD

**EMPLOYEE MUST BE ALLOWED TIME TO REVIEW THE WRITTEN DISCIPLINARY RECORD AND TO LIST ANY COMMENTS.**

EMPLOYEE'S NAME: _PATRICK D'CUNHA_

POSITION: _RPH_

DATE: _10/11/05_   TIME: _9AM_

LOCATION ADDRESS: _6620_
_1½ EAST 1st AVE, ROSELLE_

SIGNATURE
OF WITNESS: _____

SIGNATURE
OF PERSON
MAKING REPORT: _____

**HAVE EMPLOYEE WRITE ANY COMMENTS ON THE BACK.**

FACTS:
_BASED ON FINDINGS BY_
_RXMS, PATRICK IS NOT_
_FULFILLING COMPETENCY REQUIREMENT_
_PATRICK WILL BE ALLOWED TO_
_RESIGN OR BE TERMINATED_
_FROM THE WALGREEN CO._

**INSTRUCTIONS TO FILL OUT DISCIPLINARY** _(over)_
**RECORD ON BACK COVER**

_Pltffs Ex. 37.2_

Patrick Refused to Sign Statement from Tanning Atds Wanted to be As of 10/11/05.

Carl Cohen -DM

Pltf's Ex. 37.3

# NOTICE OF DETERMINATION

APPEAL TRIBUNAL   PO BOX 907
TRENTON, NJ 08625-0907

**NAME OF CLAIMANT**
PATRICK DCUNHA
**SOCIAL SECURITY NUMBER**
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
**PROGRAM CODE/DATE OF CLAIM**
10      10/16/05
**DATE OF MAILING     L.O. NO.**
11/10/05           921

**RIGHT OF APPEAL**

ANY   APPEAL   FROM   THIS
DETERMINATION     MUST     BE
SUBMITTED IN WRITING WITHIN
7 DAYS AFTER DELIVERY OR
WITHIN  10  DAYS  AFTER  THE
DATE OF MAILING. THE TENTH
DAY   AFTER   THE   DATE   OF
MAILING IS:

**11/21/05**

SEE REVERSE FOR APPEAL INSTRUCTIONS

PATRICK DCUNHA
137 -22 LABURNUM AVE
FLUSHING NY 11355

WALGREEN EASTERN CO., INC.
C/O FRICK CO
P.O BOX 283
ST LOUIS MO 63166

YOU ARE HEREBY NOTIFIED THAT BASED UPON THE FACTS OBTAINED AND IN ACCORDANCE WITH THE
NEW JERSEY UNEMPLOYMENT COMPENSATION LAW, THE DEPUTY (NAMED BELOW) HAS DETERMINED THAT:

YOU ARE ELIGIBLE FOR BENEFITS FROM 10/16/05.

YOU WERE DISCHARGED FOR POOR WORK PERFORMANCE.  SINCE YOU DID EVERYTHING
WITHIN YOUR CONTROL TO ATTEMPT TO PERFORM THE WORK SATISFACTORILY, YOUR
ACTIONS DO NOT CONSTITUTE A WILLFUL AND DELIBERATE DISREGARD OF THE
STANDARDS OF BEHAVIOR YOUR EMPLOYER HAD A RIGHT TO EXPECT.  THEREFORE,
YOUR DISCHARGE WAS NOT FOR MISCONDUCT CONNECTED WITH THE WORK.  YOU ARE
ELIGIBLE FOR BENEFITS.

Plaintiff's Ex. 38-1

**DEPUTY:**

J OTIS

**FOR:**       Dal J. Locolu

**DIRECTOR**
**DIVISION OF**
**UNEMPLOYMENT INSURANCE**

ESTA DETERMINACION AFECTA SU ELEGIBILIDAD PARA BENEFICIOS Y DESCRIBE SUS DERECHOS DE
APELAR.  SI USTED NO SABE LEER INGLES, FAVOR DE CONSEGUIRSE ALGUIEN QUIEN LE PUEDA
TRADUCIR ESTA DETERMINACION INMEDIATAMENTE.

BC26BF (R 04/05)              **APPEAL RIGHTS ON REVERSE**

R.S. 43:21-5 DISQUALIFICATION FOR BENEFITS

AN INDIVIDUAL SHALL BE DISQUALIFIED FOR BENEFITS:

(B) FOR THE WEEK IN WHICH THE INDIVIDUAL HAS BEEN SUSPENDED OR
DISCHARGED FOR MISCONDUCT CONNECTED WITH THE WORK, AND FOR THE FIVE
WEEKS WHICH IMMEDIATELY FOLLOW THAT WEEK (IN ADDITION TO THE WAITING
PERIOD), AS DETERMINED IN EACH CASE. IN THE EVENT THE DISCHARGE
SHOULD BE RESCINDED BY THE EMPLOYER VOLUNTARILY OR AS A RESULT OF
MEDIATION OR ARBITRATION THIS SUBSECTION (B) SHALL NOT APPLY,
PROVIDED, HOWEVER, AN INDIVIDUAL WHO IS RESTORED TO EMPLOYMENT WITH
BACK PAY SHALL RETURN ANY BENEFITS RECEIVED UNDER THIS CHAPTER FOR
ANY WEEK OF UNEMPLOYMENT OF WHICH THE INDIVIDUAL IS SUBSEQUENTLY
COMPENSATED BY THE EMPLOYER.

NOTE: IF THE DISCHARGE OR SUSPENSION IS RESCINDED AND THE CLAIMANT
IS REINSTATED WITH BACK PAY, PLEASE NOTIFY THE DIVISION AT THE LOCAL
OFFICE ADDRESS SHOWN AND PROVIDE US WITH A STATEMENT OF THE GROSS
AMOUNT OF SUCH BACK PAY AND THE PERIOD TO WHICH IT APPLIES. WE
REQUIRE THIS INFORMATION TO DETERMINE IF A REFUND OF BENEFITS IS IN
ORDER.

## CLAIMANT REPORTING INSTRUCTIONS

$Ex. 38.2$

To file an appeal, you must mail your appeal to the address listed below.

### APPEAL RIGHTS

A DETERMINATION BECOMES FINAL UNLESS A WRITTEN APPEAL IS FILED WITHIN SEVEN CALENDAR DAYS AFTER
DELIVERY OR WITHIN TEN CALENDAR DAYS AFTER THE MAILING OF THE DETERMINATION. YOUR APPEAL MUST BE
RECEIVED OR POSTMARKED WITHIN ONE OF THE APPEAL PERIODS. IF THE LAST DAY ALLOWED FOR THE APPEAL
OCCURS ON A SATURDAY, SUNDAY OR LEGAL HOLIDAY, THE APPEAL WILL BE ACCEPTED ON THE NEXT BUSINESS
DAY. THE APPEAL PERIOD WILL BE EXTENDED IF GOOD CAUSE FOR LATE FILING IS SHOWN. GOOD CAUSE EXISTS
IN SITUATIONS WHERE IT CAN BE SHOWN THAT THE DELAY WAS DUE TO CIRCUMSTANCES BEYOND THE CONTROL
OF THE APPELLANT WHICH COULD NOT HAVE BEEN REASONABLY FORESEEN OR PREVENTED.

**To file an appeal, you must mail your appeal to the address listed below.** Please give your reasons for disagreeing with the
determination, and if late, the reason for the delay. Be certain that the claimant's name, social security number, address, and
telephone number, if available, are clearly written on the appeal.

For additional information or assistance about filing an appeal, protest, or request for reconsideration, contact a One-Stop
Career Center.

**Mail your appeal to:**     **New Jersey Department of Labor and Workforce Development**
                            **Appeal Tribunal**
                            **PO Box 907**
                            **Trenton, NJ 08625-0907**

BC26B (R 4/05)
(B26BB)

P39

*Patrick F. D Cunha*

*117 32 Lafayette Avenue*
*Flushing, NY 11355*
*718 661 7079*

August  16, 2005

William Keller
Loss Prevention Supervisor: NJ North
*Walgreens Co.*
*211 Mountain Avenue*
*Springfield, NJ 07081*


Dear  Mr.Keller:

Herein below  are the details of the statement  you asked me to provide. It is essential to provide brief history of how I was hired, trained and my independent work as Overnight Pharmacist at East Orange store,  to contextualize the events I will discuss.

**I.**   EVENTS UPTO AND INCLUDING THE BIASED HARASSMENT I RECEIVED.

Mr. Colaizzi Jr., interviewed me on June 6, 2005 and I sent him a thank you letter the next day which summarizes how the interview went. I did not hide the fact that presently there is a lawsuit in Second Circuit Court of Appeals wherein I have filed Age Discrimination Complaint against Eckerd. I was 49 and 50 years old when Eckerd refused to hire me at two different occasions in 2001 and 2002. Please see attached letter to Mr. Colaizzi, who at that time was  Pharmacy Manager at New Store at Elizabeth, New Jersey. When I read that letter this week, I see Mr. Colaizzi's preference for the fresh graduate Pharmacists ( implying younger Pharmacists below 40 years ).

Ms. Paiva the NJ Central District Supervisor at the time offered me a full-time overnight pharmacist position in New Jersey Central District at a salary of $3700. Bi-weekly. I was required to work every other weekend, holidays, 7 consecutive overnight shifts Monday through Sunday evening based on a 72 hour bi-weekly schedule. See attachment. Along with Job offer, Ms. Paiva sent me another letter asking me to go to the appointed Manager and fill 1). Smart Hire - all four parts, 2). I - 9 Form and 3. Drug test form. Well I did fill the drug test form, but despite my repeated requests, Mr. Colaizzi Jr. who was Pharmacy Manager at the time did not let me fill the Smart Hire and I-9 forms. I now request that these forms be sent to me to see if I was intentionally prevented to fill out forms due to bias, which may reflect adversely on my personnel record.

I was at Elizabeth store from 6/20/05 to 7/1/05. Then I was asked to work at Elizabeth on July 3, 2005. I had 4th of July Holidy off. From 7/5/05 till 7/10/05 I trained under Rocco

39
Ex
39
P39

RPh at Jersey City store. While I was still at Jersey City, my payroll location was already fixed at East Orange where I worked independently from 7/18/05 to 7/24/05. I was told by Mr. Colaizzi that East Orange would be my permanent store. Mr. Colaizzi Jr. abruptly and unnecessarily transferred me to Roselle on a pretextual basis as the Pharmacy Manager Ms. Neema at East Orange never told me any such thing. If she had a problem with me she would have told me on 7/25/05 morning when she relieved me after my overnight shift. In fact I had to go to East Orange one more time to return the Narcotics key, only after Mr. Colaizzi Jr. took the biased decision to suddenly transfer me to Roselle.

Mr. Colaizzi's excessive insistence that I perform at the level of senior pharmacists, despite the fact that there are many younger pharmacists who are still learning the ropes (despite being with Walgreens 6 months to one year) and can not yet perform all of the duties without help, clearly is biased and unequal treatment because I am old ( over 40 ). Why this discrimination and excessive impatience with me? Even Ms. Keisha RPh (I do not know exact spelling of the name) spent hours helping her own friend, a newly hired RPh working for another Walgreens store. The circumstances under which Ms. Keisha was appointed to further train me raise doubt about Mr. Colaizzi's intentions.

I was working independently at East Orange Walgreens, when on a weekend I believe, Ms. Keisha RPh  called me and started ridiculing me and said things, not even my Pharmacy Manager Ms. Neema ever  told me. Ms. Keisha said why was it so difficult to finish the job and what's the big deal, what the heck was happening and so on. Amazing thing is that I did not even know Ms. Keisha, so why was she calling me and who was she? {Phone records will show that there was a call made from Roselle store to East Orange store on a late night or early morning between Friday to Sunday ( July 22 to 24 )}. There are few other things I need to mention about East Orange: This being my first 7 nights period, working independently as an Overnight RPh I think I was moving on quite well. Of course, as all newly trained pharmacists, I too was slow in the beginning however, by the end of  7 day period I was beginning to pick up speed in doing my work. I knew that as weeks and months pass by, I will get evermore efficient. There were a couple of things that I did not have exposure to, during my training at Jersey City, I noted those down on my Overnight Sign on sheet. I remember specifically third party insurance, and my Pharmacy manager Ms. Neema had asked me to come work with her the following Friday to get hands on experience of the same. Besides this, there were a couple of days when there was a high volume of both drive in and walk in customers, and I did not get any help at the cash register despite requests. On one of these days due to unusual circumstances with a customer, I voided a prescription that I had already rung up. I later realized the problem and informed my manager as well as wrote on sign on sheet offering to pay for the voided amount if Walgreens wants me to. I will always take responsibility for my own actions, I always have.

At East Orange, RPh Oruchi,  just called me at 8:00 a.m. one day and said, " I just woke up." This was irresponsible for a professional and as a result I left Pharmacy at 9:20 a.m.

2

39.2

when Ms. Oruchi came in. As result I reached home 2 ½ hours late. Considering that my travel time each way takes minimum 2 ½ hours, I lost significant sleep time that day. It is unfair to those affected when professionals behave irresponsibly. Walgreens does not tolerate employees being late, and yet Mr. Colaizzi, instead was telling me about Oruchi's complaint that I did not file prescriptions properly, which I believe I did. Additionally, Oruchi should let me know, what was done wrong so I could correct it, that's Walgreens way of doing things. Even Mr. Colaizzi had made mistakes in filing and logging Schedule II prescriptions when he was Pharmacy manager at Elizabeth. Mr. Colaizzi Jr. also did not follow Walgreens approach of communicating to me what mistake ( if any) I made in filing prescriptions. Walgreens expects employees to take care of local problems locally and prevent them from becoming bigger problems. So here again, Mr. Colaizzi had one standard for Oruchi RPh who is obviously younger than 40 years, and a different standard for me ( Patrick D'Cunha) who is over 40 years old (53 years to be specific). Oruchi's only reason to complain to Mr. Colaizzi Jr. was to get back at me for not agreeing to come in early for 1 hour 20 min. extra time she made me work because of her irresponsible behavior. Oruchi does not understand that I can not come in 1 ½ hour early, because that takes away my sleep time, as there are no connecting trains at convenient times. To adjust like Oruchi wanted me to, I would have to leave home 2 ½ hours earlier than usual. I let my Pharmacy manager know about this problem, and Ms. Neema told me that we should resolve these small problems among ourselves, which was something for me to think about. My Pharmacy manager Ms. Neema never told me I was not meeting minimum standards. Mr. Colaizzi Jr.'s claim has no basis that I was not meeting minimum standards when he transferred me to Roselle from East Orange store.

I want to make it clear that the Pharmacy manager at Roselle, Mr. J.J. as well as staff pharmacist Mr. Francis were very helpful and showed great willingness to help me if I needed any help at all, including Third party insurance. I request the Walgreens management to please allow me to work for one week daytime at Roselle when either J.J. or Francis are scheduled to work there, because that will help me a great deal to be even more efficient in my work. After working at Jersey City, East Orange, Roselle ( I was forced not to work here) and Linden, it is clear to me that while most basic things like clearing Work Queue, Prescription logging and Deletes are common, there are other local variations different from one store to another, as expected by Pharmacy managers.

Ms. Keisha RPh's role in the harassment and slave-like treatment I received at Roselle store:
I was harassed, humiliated and stripped of my human dignity when Keisha treated me like a slave around 2:00 a.m. on 8/3/05. She was so upset that I had not finished the Work Queue earlier, she told me to just log out of every computer, including drive thru and asked me to just stay away, do nothing. I attempted to bring medications for different prescriptions, she was fuming with anger. I tried to stock the vials and bottles she said just leave it. I tried to take out the garbage and she literally screamed at me. Finally, when I realized Ms. Keisha would permit me to do practically nothing, I started to check Lot No. and Expiration dates in order to keep myself sane, through those torturous 5 and ½

39.3

hours till 7:30 a.m. on 8/3/05. Only in retrospect I now realize, that she wanted to make several accusations against me to Pharmacy manager J.J. that's the reason Ms. Keisha asked me to leave a little early that day because she did not want me around to disagree with her definitely biased and fabricated report. I know this because I read the email J.J. sent to Mr. Colaizzi Jr. wherein he mentioned about Keisha making a number of complaints to him about Patrick. I am now convinced, Ms. Keisha RPh was there Not to train me but to intimidate and harass me with the intention, I will not be able to work under continued harassment and mistreatment and finally leave the Company.

Some of the stories Ms. Keisha fabricated to stress me out at Roselle:
1) One customer complained that you ( Patrick) did not understand and speak English properly,  This charge needs no explanation from me.
2) Another customer  was going to make a complaint to the District office that I was rude and did not want to help. To this charge, I say, I am willing to stake my own credibility against that of Ms. Keisha, and let people find out who is rude and who is polite. I only want to cite just one example, when I was helping one customer on the phone at East Orange, another customer who was waiting, told me if I had some one so patient, helpful and supportive, my life would be lot more fun. However, Ms. Keisha when helping a drive thru customer asked for his address, he wanted to know if all customers are asked to provide this information and she said, always. When the customer left, Keisha who was on the phone with a friend of hers ( she talks on the phone for hours every day she works and truth of this can be checked against Roselle pharmacy overnight phone records) used a four letter word saying ----ing idiot and complaining about that customer. So much for Ms. Keisha's customer service. Customer service is not just mechanical lip service to be used only when serving customers, it needs to come from one's heart. The former type of customer service, customers soon get weary of and move on to other stores for their needs.

3) Ms. Keisha also tried to humiliate me trying to explain to me ( in front of customers ) basic abbreviations such as OTC, P.C. and other such things.
4) Once Ms. Keisha scolded me in front of customers for not ringing up all of their items together. However, it was another customer who immediately told Keisha, " Excuse me madam, you are wrong, I saw this man did nothing wrong. This lady brought in her items and asked to ring up and gave her credit card. It was a little later that her daughter brought in her items and asked to be billed together. It is not his mistake at all."
The following two fabricated stories Ms. Keisha told Mr. Colaizzi Jr. in my presence on 8/5/05 morning :
5) Patrick took one hour to enter just one prescription, which is all he did last night. This one does not even deserve a response. However, it needs to be mentioned that Ms. Keisha once again refused to let me do anything that could be appropriately called function of a pharmacist. I did not want to be standing there during the entire overnight shift, so I called J.J. the pharmacy manager who told Keisha to fill prescriptions for waiting customers and let Patrick take care of all other customers, which of course we had very few that day. J.J. also asked me to continue People Plus Computer training of which I did many programs.

4

39.4

6) Keisha told Mr. Colaizzi Jr. Patrick filed all prescriptions wrongly. When asked to show the wrongly done work, Keisha first moved to the file cabinet and realized she could not prove it, so she stepped back and said Oh, I remember, I already fixed it.

When I asked Mr. Colaizzi Jr. if he believed I took one hour to do one prescription and that I filed prescriptions wrongly, he said he did not believe these things. Despite this fact, Mr. Colaizzi Jr. accepted tainted report of Ms. Keisha whom he could not trust to tell the whole truth. Additionally, Mr. Colaizzi's decision to transfer me to Linden indicates a clear bias for another important reason: in acting based on just Keisha's fabricated biased report, he also clearly ignored J.J.'s email in which J.J. had told Mr. Colaizzi Jr. that he had asked Patrick to come work with him on two days during next week so he could learn some more about Third party Insurance. This was a second time Mr. Clazzi Jr. had taken arbitrary decision, violating Walgreens policy and procedure. One such policy is to let the pharmacy staff solve their local problems locally, before they become bigger problems. None of these two cases indicate something the Pharmacy managers at East Orange and/or Roselle pharmacy could not handle. One reason Mr. Colaizzi Jr. did not tell Keisha to stop treating me (Patrick) the way she did, because he knew she was doing exactly what he had asked her to do. I believe J.J. realized Keisha did not really want to train Patrick, so he told her to do what she wanted to do and asked me to do other things so there would be no room for conflict.

**II.**     My reasons for being absent for work on 8/3/05 and again on 8/5/05 and 8/5/05:
Main reason I did not work on these days, is only the extreme kind of harassment and discriminatory treatment I received on 8/1/05, 8/2/05 and 8/04/05 from RPh Keisha (who followed whatever Mr. Colaizzi Jr. District Pharmacy Supervisor asked her to do. She told me. Mr. Colaizzi Jr. contacts her often, including calling her early morning on her cell phone regarding me - Patrick) that I could no longer work under this kind of cruel and discriminatory work environment. Under these circumstances, I tried unsuccessfully to contact Mr. Colaizzi Jr. on 8/3/05 morning and then called Ms. Wanda District Scheduler and requested her to pass on my request for a leave of absence, to Mr. Colaizzi Jr. I called Wanda from my cell phone. It was only the next day 8/4/05 when I spoke to Mr. Colaizzi Jr. that he told me, leave of absence request was denied. Already I would have been justified at this juncture not showing up for work because of work environment, that I knew awaited me working under Keisha and yet I returned to work on 8/4/05 literally like a scared rabbit. It is unbelievable how Mr. Colaizzi Jr. tried to justify Ms.Keisha's behavior by finding faults with me instead. Not once did Mr. Colaizzi Jr. tell me that he was sorry for the kind of work environment I faced, or that he would make sure Ms. Keisha would not mistreat me again.

In fact I was shocked that after one more overnight shift ( 9:30 a.m.8/4/05 to 7:30 a.m. 8/5/05) of further mistreatment by Ms. Keisha Rph , I find Mr. Colaizzi Jr. walks into the pharmacy to intimidate me for apparent underperformance as he would tell me later. Mr. Colaizzi Jr. by his own admission agreed he did not believe a few things Ms. Keisha told

5

39.5

him in my presence because they were unbelievable. However, instead of having a common discussion of how things are going, Mr. Colaizzi separated the two of us and finally brought in Mr.Beans Assistant Store manager as if I was the one who had done something wrong. The Supervisory notes of Mr. Colaizzi Jr. are a clear indication he planned to transfer me to Linden in order to protect Ms.Keisha. This is the reason, Mr. Colaizzi Jr. once again ignored even written feedback from J.J. the pharmacy manager at Roselle who in an email had told Mr. Colaizzi Jr. that he had asked Patrick to come work with him on two week days so he could get some experience on Third party insurance. Mr. Colaizzi Jr. ignored the pharmacy manager J.J. and transferred me to Linden to protect Ms.Keisha and himself. At the end of this meeting, because of this further intimidation on top of the discriminatory harassment I had already faced for three days, I did believe and still do, that Mr. Colaizzi Jr. made it so hard for me to work, that I simply could not. I even told him with tears in my eyes, if you want me to go, why don't you just fire me. However, despite having faced hell, I did manage to get a hold of myself with support from my family. Even though I did leave a message on a District Office voice mail,  I can not recall if it was on 8/5/05 or 8/6/05 ( I am not sure if that was Walgreens general voice mail or Mr. Colaizzi Jr.'s specific one) wherein I had under pressure requested Mr. Colaizzi Jr. for a change of status from RPN (Overnight Pharmacist ) to a day pharmacist. Again under pressure, I was also willing to float between two stores if needed. But today, I can confidently say, all that was not necessary and I did perform well enough independently as an RPN at East Orange and I will do even better job as my experience grows, just like other Pharmacists at Walgreens.  Walgreens can check my home phone records as well as cell phone records for all the phone calls incoming and outgoing along with District office phones to check truthfulness of my statements. If Walgreens does not believe my statements, I am willing to give statement of no objection to my home phone company IDT AMERICA, and also to CINGULAR, my cell phone company. I may have called different District Office phone numbers to reach Mr. Colaizzi Jr. at different occasions.

Mr.Colaizzi Jr. once approached me ( while I was doing computer training at Elizabeth store, last two weeks of June 2005 ) and said, "Patrick, this is what a Pharmacist ought Not To Do: You remember  this young  pharmacist who came in a while ago, she was scheduled to work 2:00 p.m. shift. She calls and says I'm in Boston and will be 1 hour late. She comes in 2 hours late. After 5-10 minutes, she says, I am not well and walks out." I tell you, she is fired, this is just wrong, Mr. Colaizzi Jr. says to me. However this same pharmacist was still working for Walgreens because I saw her on duty at another pharmacy. Apparently, Mr. Colaizzi Jr. has different yardstick, different guidelines to apply to young pharmacists and totally different ones for older ( over 40 ) pharmacists like me. I am certain, if I was in place of that young pharmacist, I would have been fired by Mr. Colaizzi Jr. Why the different treatment? Then there was another person, a young pharmacy manager who used to leave the pharmacy 2 hours early every day, Mr. Colaizzi Jr. was once telling pharmacy staff at Elizabeth. One pharmacist said, why not fire him. Mr. Colaizzi Jr. at that time was still a Pharmacy manager himself and did not have authority to fire another pharmacy manager. However, I believe even that pharmacy

6

396

manager is still with Walgreens, if not I would have heard of it in the next few weeks I have been working. Again different kind of treatment for different people. Is it OK for Walgreens if young pharmacists come late to work, leave before time, commit all kinds of errors at different times but Not OK when older pharmacists are involved in similar incidents? I have not been involved in any of these incidents and yet I have been a victim of biased harassment.

I now ask Walgreens management, who is really responsible for the three days of work that I lost? It was not just showing up at work place for me. It was an opportunity to become better at offering best service to customers I possibly can. It was also an opportunity to provide financial support to my family. I did not stay home for entertainment purpose or to rest and relax. Those were agonizing days both for me, my wife and my three school going daughters as well. Additionally, this next few nights period till I am scheduled to work is also a loss for customers, for Walgreens and for my family as well. Can Walgreens justify this action with regard to this whole matter? Who is responsible for this entire problem?

It is clear that Ms. Keisha RPh harassed me and treated me like a slave especially during overnight shifts on 8/2/05 and 8/4/05. It is also clear that Mr. Colaizzi Jr. ignored Walgreens stated policy and procedure and took arbitrary decisions (bypassing two pharmacy managers- Ms. Neema at East Orange and Mr. J.J. at Roselle) because of age bias, that affected adversely on my employment at Walgreens. As of this day, (as on the first day when I accepted Walgreens job offer) I want to continue to work for Walgreens with dedication and commitment, the best employees can have. However, I refuse to be discriminated against because of my age or any other factor that the law prohibits.No employee should ever have to face what I faced at work as stated above.

Mr. Colaizzi Jr. has already declared me guilty even before the investigation is done, because he has prevented me from working my regularly scheduled overnight bi-weekly shift from 8/15/05. It is clear, there is already a bias in the investigation, as Patrick's guilt is already presumed for which he is penalized. However, I ask Walgreens management, that as I have already stated Mr. Colaizzi Jr. was one of the individuals along with Ms. Keisha, he should not be part of the investigating team. I further ask Walgreens to please schedule me for work as soon as possible. I have already missed nearly three weeks of work not of my free will but only due to extreme and harassing work environment.

I have earlier requested Mr. Colaizzi Jr. to please send me the Supervision notes he wrote regarding me (which I know were biased) in a printed or typed form as I can not read the handwritten version. It is important for me to be able to respond to those notes. I remember just one thing, when Mr.Colaizzi Jr. asked Mr. Beans if he observed Patrick being slow, Mr. Beans said I did not personally see that but Keisha told me ...

Finally neither Ms. Neema Pharmacy manager at East Orange, nor Mr. J.J. Pharmacy manager at Roselle, ever tell me verbally or in writing that I am not meeting minimum

7

39.7

job requirements. If they had told me so, I would have asked them to prove it based on performance of other newly hired pharmacists including the ones working for 3 months to one year. Mr. Colaizzi Jr.'s visit to Roselle should have been used to admonish and discipline Ms. Keisha but he did not do that only because he was desperately seeking for a pretext to fire Patrick He was so blinded by the age bias that he ultimately tried to protect Keisha and blamed Patrick instead for not meeting minimum job requirements. How could Patrick meet any job requirement at all when he was prevented from doing anything at all, worse than a slave like treatment at Roselle. East Orange was certainly not like this and there Patrick did perform well (not as fast as senior pharmacists but they all were slow when newly hired).

I have not received any training manual and an orientation handbook. I request for a copy of each as People Plus says we must read these. There are many more things I have, but due to time and space constraints I am unable to do so.

I hereby ask Walgreens Company to do what is right and find a FAIR AND JUST SOLUTION to this entire episode of discriminatory harassment and slave like treatment.


Thank you for your consideration to this matter.



Sincerely yours,

Patrick FD'Cunha.
PATRICK F. D'CUNHA RPh


CC:   *John Colaizzi Jr. Pharm D*
       *District Pharmacy Supervisor*

Enclosed Attachments: 1.    Thank you letter to Mr. Colaizzi Jr.
                     2.    Ms. Paiva's letter to Patrick
                     3.    My schedule 8/6/05, 8/7/05
                     4.    My schedule 8/13/05 - 8/19/05


8

39.8

Exhibit "F"

1

<pre>
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2              CASE NO. 02-4157

 3   PATRICK D'CUNHA,                 :      ORIGINAL
                                      :
 4        Plaintiff,                  :
                                      :   VIDEOTAPED
 5        vs.                         :   DEPOSITION OF:
                                      :   JOHN COLAIZZI, JR.
 6   GENOVESE/ECKERD CORP.,           :
                                      :
 7        Defendant.                  :
                                      :
 8   - - - - - - - - - - - - - - - -

 9

10              TRANSCRIPT of the stenographic notes of

11   the proceedings in the above-entitled matter, as

12   taken by and before JANE GARBUS, a Certified Court

13   Reporter, License No. 1648, of the State of New

14   Jersey, held at the office of GENOVA, BURNS &

15   VERNOIA, ESQS., 354 Eisenhower Parkway, Livingston,

16   New Jersey, on November 16, 2007, commencing at

17   11:10   a.m.

18

19

20

21

22

23                                        ,

24

25
</pre>

2

1

A P P E A R A N C E S:

2

3                  PATRICK D'CUNHA
                  137-22 Laburnum Avenue
                  Flushing, New York 11355

4                  Pro Se Plaintiff

5

6                  GENOVA, BURNS & VERNOIA, ESQS.
                  BY: JAMES BUCCI, ESQ.

7                       -and-
                  SHIRIN SAKS, ESQ.

8                  354 Eisenhower Parkway
                  Livingston, New Jersey 07039

9                  Attorneys for Defendant

10

11  A L S O   P R E S E N T:   JAMES ROBERTS, NATIONWIDE
                               VIDEO PRODUCTIONS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

1    A   I'm not certain but I believe he started

2 in Jersey City.

3    Q   That's an overnight store?

4    A   That's correct.

5    Q   Did he move from there to another store?

6    A   He did.  We initially placed him at the

7 Walgreens in East Orange because we had a need for

8 an overnight pharmacist at that location.

9    Q   Why was he transferred from Jersey City to

10 East Orange?

11    A   Jersey City was just for training

12 purposes.  It was a very good training store that we

13 had trained pharmacists in but there was no open

14 position there.

15    Q   So the position in East Orange, that's a

16 store located in East Orange, New Jersey?

17    A   That's correct.

18    Q   And there was a position for him as an

19 overnight pharmacist?

20    A   Yes.

21    Q   Can you -- do you have any knowledge of

22 what his performance was at the East Orange store?

23    A   His performance was substandard which was

24 communicated to me by the pharmacy manager at that

25 location.

14

1      Q      And who was the pharmacy manager?

2      A      Her name was Neema Patel.

3      Q      And do you have a recollection as to what

4  the nature of his performance problems were?

5      A      Just not meeting minimum standards:  Not

6  processing prescriptions, not adequately taking care

7  of our patients, not maintaining adequate records.

8              MR. D'CUNHA:  Excuse me, Mr. Bucci.

9              MR. BUCCI:  Yes.

10             MR. D'CUNHA:  When do I get my cross, sir?

11             MR. BUCCI:  When I'm finished with my

12  questions, sir.

13             MR. D'CUNHA:  Okay.

14     Q      I'm going to give you a document marked as

15  Colaizzi-11.  And this, sir, is a series of e-mails

16  and it's Bates stamped at the bottom which means it

17  was produced to Eckerd in response to the subpoena

18  that was served upon Walgreens.  It says

19  Walgreen-ER22 through 42.

20     A      Okay.

21             MR. D'CUNHA:  I object to the entire set

22  of exhibits Number 11 as they are totally

23  fabricated, the set of documents.  They were never

24  produced to me and as an employee, they were never

25  produced in the EEOC investigation and this is a

17

1      Q    Do you recall receiving this e-mail dated

2  June -- July 21, 2005?

3      A    Yes, I do.

4      Q    It indicates that there were performance

5  problems with Mr. D'Cunha at the East Orange store.

6  Is that correct?

7      A    That's correct.

8      Q    If you look at the second -- the third

9  sentence, it says, "I feel he absolutely needs more

10  training during the day because he is not all

11  familiar with Intercom Plus."

12           What is Intercom Plus?

13      A    Intercom Plus is our proprietary software

14  system for processing prescriptions.

15      Q    The next sentence says, "He does not know

16  how to make or remove," and then it says, "O-O-S"

17  apostrophe.  What is that?

18      A    Out of stock prescriptions.  So if a

19  patient presents a prescription and we don't have it

20  in stock, we'll create an exception in the software

21  termed OOS.  So when the drugs come in from either a

22  wholesaler or from our distributor, the pharmacists

23  are to remove that so that the patient can get their

24  medicine.

25      Q    And then the next part says, "He does not

18

1   know how to resolve any TPR."  What does that refer

2   to?

3        A     TPR is a third-party reject, if a

4   patient's third-party plan rejects a prescription.

5             Would you like me to explain the other?

6        Q     Yes.  This is "CMD"?

7        A     "CMD" is a "call MD," so if a patient asks

8   us to call their physician, we will put an exception

9   on the prescription to call the physician.

10            "WCB" is "will call back" which means that

11  the physician -- we're waiting for the physician to

12  call us back.

13            And "DUR" a "drug utilization review."

14  That's an exception we put on a prescription if a

15  physician writes a prescription that has either a

16  severe dosing error or a severe drug interaction or

17  some other problem with -- related to the patient's

18  drug therapy.

19       Q     And then it says, "Log in C-2 or even fill

20  file for that matter."  What is that?

21       A     C-2 is Schedule 2 controlled substance

22  which at the time our pharmacists were required to

23  keep an inventory log.  Filing prescriptions is what

24  I referred to as recordkeeping, where we have to

25  keep prescriptions in sequential order as per State

19

1   Board of Pharmacy regulations.

2          Q      What was your response or reaction to

3   finding out from Neema that Mr. D'Cunha did not

4   have -- was incapable of doing the things that were

5   listed in this e-mail that you just reviewed?

6          A      Well, I mean, in one sentence she

7   mentioned, and I believe we spoke over the phone,

8   that she felt that he needed additional training.

9   She even said not because he's lazy, but because he

10  needs more training.  At which time I believe I --

11  we asked him to go to another store.  I believe to

12  the Roselle store.  One, because it's slower, it was

13  slower volume compared to this East Orange store;

14  and also, to get more training.

15         Q      Did you ever speak with Neema about Mr.

16  D'Cunha's performance at the store?

17         A      Yes.

18         Q      And what was discussed during that --

19  those discussions, is there anything different than

20  what's in the e-mail?

21         A      No, nothing different.

22         Q      If you could turn to the next e-mail.

23  It's dated July 25, 2005.  It's an e-mail dated at

24  the bottom document ER -- WAL -- WAL-ER24.  It's a

25  document from Oruchi Opara.  Did you receive that

20

1   e-mail from Miss Opara?

2        A     I did.

3        Q     And can you just summarize what the nature

4   of the e-mail was?

5        A     This was an unsolicited e-mail I got from

6   one of the practicing pharmacists at this location

7   who first mentioned to me that she was late.   She

8   woke up late.   She called the pharmacist to inform

9   him and also gave me a summary of his performance

10  and what she walked into when she came in that

11  morning.

12        She also stated that I believe Patrick

13  accused her of sabotaging his work to get back at

14  him for some reason.

15       Q     Did you ultimately make any decisions as

16  to what to do with Patrick D'Cunha as he worked at

17  the East Orange store?   I mean, did you ever make

18  any decisions that -- with respect to him working at

19  that store to move him, leave him there?

20       A     We did.   We decided to move him to a

21  different location that was lower volume and also so

22  he could have more training.

23       Q     And why is it that you made the decision

24  to transfer him to a store that had lower volume and

25  give him additional training?

22

1  two-page -- they are two separate exhibits but it's

2  the same document.  Is that correct, Mr. Colaizzi?

3      A    Excuse me?

4      Q    Exhibit 5 and Exhibit 6 are just two pages

5  but they're the same -- they're notes of the same

6  meeting?

7      A    That's correct.

8      Q    Page 1 and 2?

9      A    Yes.

10     Q    And did you -- when did you write these

11 notes?

12     A    I took these notes during the course of

13 the meeting, I believe between 7:30 and 8 a.m.

14     Q    And did you take these notes as part of

15 your job duties as a pharmacy?

16     A    Yes.  Just documenting the conversation

17 that we had.

18     Q    Is it within -- is it a regular part of

19 your employment to take notes of certain meetings

20 that you deem to be necessary to take notes for?

21     A    Certainly.  And we always -- we always

22 have a witness present just to verify the validity

23 of it.

24     Q    Can you read the first entry there on your

25 notes?

23

1    A    It says, "Meeting with Patrick D'Cunha and
2  Mr. Bean."  "MGT" stands for "assistant store
3  manager."
4    Q    And then it lists various items.  Can you
5  describe what these items are?
6    A    These are I believe items -- Patrick
7  worked the previous overnight shift which ended at
8  7:30 a.m., and Mr. Bean, I believe, was the
9  overnight assistant manager, so he provided me some
10  feedback on what occurred during the night.
11        The first says, "Patrick told a customer
12  to find a product on her own because he did not know
13  where to find it."
14    Q    And then underneath that it says what?
15    A    "Patrick does not recall this."
16    Q    And the second entry, next one, says,
17  "Mr. Bean."  Can you read that?
18    A    "Mr. Bean stated that prescription filling
19  took longer than usual."
20    Q    And can you read the next one?
21    A    "Patrick states that he was treated as a
22  kid, not as a pharmacist.  She," referring to
23  "Keisha," Pharmacist Keisha, "was embarrassing him
24  in front of customers."
25    Q    And can you go down to the next one and

24

1   read that, please?

2        A    "Patrick did not show up to work on

3   8/3/2005 without approval.  He states this is

4   because he became humiliated and did not want to

5   return to work."

6        Q    These items that appear on this page, were

7   they reported to you?

8        A    They were reported to me during the course

9   of the meeting, yes.

10       Q    By Mr. Bean?  Is the person who reported

11  these to you Mr. Bean?

12       A    Well, the first two were.  The second two

13  it says, "Patrick states that" and "Patrick did not

14  show up to work on," "he states that this is

15  because," that came from Patrick.

16       Q    The second two were from Patrick, and the

17  first two were incidents reported to you by

18  Mr. Bean.  Is that correct?

19       A    Yes, that's correct, during the course of

20  the meeting.

21       Q    If you could turn to the next page, which

22  is now Exhibit 6, and it states the first --

23       A    States "Patrick" -- would you like me to

24  read it?

25       Q    If you could, please.

25

1    A    "Patrick has been training for five weeks

2 and still is not meeting minimum job requirements,"

3 and "Patrick disagrees."

4    Q    What -- was that your -- was it your

5 conclusion that Patrick was not meeting minimum job

6 requirements?

7    A    It was my conclusion based on feedback

8 from the staff.

9    Q    And was it the staff whose job it was to

10 train Mr. D'Cunha for the position?

11    A    Yes.

12    Q    If you could read the next entry, please?

13    A    I -- I can't read the second word.

14    Q    Is that "feels"?

15    A    Yes, thank you.

16    "Patrick feels that my goal is to kick me

17 out and if I send him to train in Linden, he will

18 resign."

19    Q    How did the -- did the word "Linden" come

20 up in your conversation?

21    A    It did, yes.

22    Q    In what context did it come up?

23    A    Linden is an adjacent town to Roselle.  We

24 have a Walgreens in Linden approximately two miles

25 from this location.  If I recall correctly, it was a

28

1     A     He did, yes.

2     Q     And is that Mr. Bean's signature there as

3  well?

4     A     That's correct, yes.

5     Q     There's a reference to an incident in

6  which Mr. D'Cuhna did not come in to work and

7  involved a woman name Keisha.  Do you have any

8  recollection of that, sir?

9     A     I recall he did not show up for work.  I

10  don't believe I knew until the next day when the

11  staff told me.  And he stated that he did not -- I

12  certainly -- nobody approved him to not come to

13  work.  He was scheduled and did not show up.  And he

14  stated it was because he became humiliated and did

15  not want to return to work.

16     Q     Did you ever look into this incident

17  involving an alleged incident with the woman named

18  Keisha at the East Orange store?

19     A     Yes.  Specifically my loss prevention

20  supervisor, William Keller, looked into the

21  allegation and it's his job to investigate any such

22  charges in the district.

23     Q     So let me move forward.  After

24  transferring Mr. D'Cunha on August the 5th, 2005 to

25  the Linden store, did he report to the Linden store?

29

1      A     He did work at the Linden store.  I don't

2  recall if he reported the first day.  There may have

3  been other days where he didn't show up to work.  I

4  don't recall.

5      Q     I'm going to give you another document

6  marked as Colaizzi-7.  It's dated August 15, 2005.

7  It's a letter addressed to Mr. D'Cunha, purports to

8  be by you.  Do you recall this document?

9      A     I do, yes.

10     Q     Did you send this to --

11     A     Yes.

12     Q     Why did you send it to him?

13     A     I sent it because he claimed he was being

14  discriminated against and was given hostile

15  treatment by Keisha, and it was -- it's our job to

16  investigate such claims.

17     Q     Do you recall what led to that meeting,

18  who requested it?

19     A     I do not recall if we requested it or if

20  William Keller requested it or if Patrick requested

21  it.

22     Q     In your note, which is attached as Exhibit

23  7, it states that he made accusations of

24  discrimination and hostile treatment by a coworker.

25     A     Um-hum.

30

```
 1        Q     Is that what happened at the meeting?

 2        A     Yes.  He complained that -- it may have

 3   been the meeting I had with Andrej Bean.  Again, I

 4   apologize, I don't recall.

 5        Q     Okay.

 6        A     But yes, he claimed he was given hostile

 7   treatment by Keisha, and he did not show up to work

 8   on August 3rd, August 5th or August 6th because of

 9   this.

10        Q     I'm going to give you another document

11   marked as Exhibit 8.  It's a letter dated August 16

12   from Mr. D'Cunha to William Keller of Walgreens, and

13   on the last page, which is page 8 of the document,

14   you are listed as having received a carbon copy.

15   Did you receive this document while you were -- in

16   August of 2005 -- in the 2005 time period?

17        A     Yes, I recall seeing this.

18        Q     Have you ever read this document prior to

19   your deposition?

20        A     I have.

21        Q     Is there -- there are allegations of

22   unfair treatment towards Mr. D'Cunha involving you.

23   Are you aware of that?

24        A     I am.

25        Q     Have you ever treated Mr. D'Cunha -- have
```

32

1  recommend him for hire for the position?

2      A    I did.  Although he did not have recent

3  experience, he had a lot of great ideas and we

4  thought he -- we thought we could recommend him for

5  hiring.

6      Q    If you look at the next paragraph it says,

7  "Mr. Colaizzi did not let you fill the Smart Hire

8  I-9 form."

9          Do you preclude Mr. D'Cuhna from filling

10 out any forms?

11     A    I did not.

12     Q    If you could turn the page, please, at the

13 top of next paragraph, the second line, the sentence

14 begins, "I was told by Mr. Colaizzi that East Orange

15 would be my permanent store.  Mr. Colaizzi, Jr.,

16 abruptly and unnecessarily transferred me to Roselle

17 on a pretextual basis as the pharmacy manager.

18 Ms. Neema never told me any such thing."

19         Did you ever transfer -- strike that.

20         What was the reason why you transferred

21 Mr. Colaizzi to the Roselle store from East Orange?

22     A    Mr. D'Cunha, why we transferred

23 Mr. D'Cunha?

24     Q    Yes.

25     A    Because he needed additional training as

35

1     Q   As of August 16, 2005, did he perform at

2 the level of minimum standards?

3     A   No.

4        (A discussion takes place off the record.)

5     Q   Was it the position of Walgreens that

6 after conducting its investigation that the

7 allegations of discrimination and harassment made by

8 Mr. D'Cunha, that they were true or untrue, was a

9 decision made concerning that?

10    A   The decision was made that they were

11 untrue.

12        MR. D'CUNHA:  Nobody was informed.

13        (A discussion takes place off the record.)

14    Q   I want to go back to Exhibit C-11 which

15 are the e-mails that you identified earlier.  You

16 have that right in front of you, sir.  Right there.

17        And I ask that you go to page 33, it's

18 Bates stamped at the bottom.

19        I'm looking at an e-mail dated

20 September 14, 2005 addressed to you?

21        MR. D'CUNHA:  Exhibit number, please?

22        MR. BUCCI:  It's Exhibit 11.

23        MR. D'CUNHA:  Thank you.

24    Q   It says report from and the person's name

25 is K-A-S-I-A.  Who is that, sir?

37

1      Q      And did you read this e-mail?

2      A      I did.

3      Q      And what did you conclude after reading

4  this e-mail?

5      A      I concluded that he was still not meeting

6  our minimum performance standards.

7      Q      How many times was Mr. D'Cunha -- how many

8  different opportunities was he given at training at

9  how many different places?

10     A      I believe we gave him four separate

11 attempts at training.

12     Q      Is there any standard or norm at Walgreens

13 concerning the number of times you give a new hire

14 pharmacists chances at training?

15     A      To my knowledge, the most attempts at

16 training we've given in this market is two.

17     Q      And why is it that two is the most that

18 you've given?

19            MR. D' CUNHA:  I object on false

20 information because Walgreens has enough information

21 on People Plus for pharmacist training and it

22 totally contradicts what Mr. Colaizzi is right now

23 testifying.  I have a set of those things and he

24 totally violated Walgreens' policies and they have a

25 way of getting around it --

40

1   federal rules to suggest a line of answer to a

2   witness.

3           MR. BUCCI:  Okay.

4           MR. D'CUNHA:  Whichever.  This is your

5   witness.  This witness is definitely your witness.

6   Your cooperation is ganging up together, sir.

7           MR. BUCCI:  If -- okay.  I will -- you've

8   stated your objection.  I'm going to state something

9   for the record and then continue.  I'm not here to

10  argue with you, sir.

11          MR. D'CUNHA:  Okay.  Nor am I.

12          MR. BUCCI:  My position is that he's

13  already testified that there were performance

14  problems in the store and I was asking him to expand

15  upon that.

16      Q   So I will ask you a question:  What were

17  the performance problems that he had in connection

18  with his training?

19      A   He was unable to adequately operate our

20  software system is one.  We felt he was putting our

21  patients at risk.  He was unable to do, for

22  pharmacists, simple thing as calculating insulin

23  dosages, to take telephone prescriptions accurately.

24          MR. D'CUNHA:  I totally object to this.

25          MR. BUCCI:  Okay.  Sir, he's answering a

41

1   question.   You just can't interrupt the witness,

2   please.   You just have to let him -- you can

3   disagree, that is your right but we're here to have

4   him testify.   This isn't an argument opportunity for

5   you.

6          Q       So if you could continue, please.

7          A       And also related to patient care, he was

8   unable to answer simple drug information questions

9   regarding common drugs.

10         Q       And how does that put patients at risk,

11  how did his conduct put patients at risk at

12  Walgreens?

13         A       For example, he took a prescription for a

14  drug over the phone from a physician.   The drug that

15  he wrote down was spelled A-V-I-E-N.   There's no

16  such drug.   They asked Patrick what drug it was and

17  he said it was probably for Ativan, which is a

18  tranquilizer and in reality, it was for a completely

19  different drug named Ambien.

20         Q       Did you receive more than one complaint

21  about his conduct putting patients at risk in the

22  stores?

23         A       I did, yes.

24         Q       Do you recall how many complaints of that

25  nature you received?

42

1       A       It was numerous.  I don't remember exactly

2   how many.

3       Q       Can you go through -- well, were there any

4   other performance-based problems that he had other

5   than what you already identified?

6           MR. D'CUNHA:  Object to the line of

7   questioning, please.

8           MR. BUCCI:  Okay.

9       Q       You can answer, sir.

10      A       He was unable to keep pharmacy

11  recordkeeping, which is a job requirement for

12  pharmacists such as filing prescriptions in

13  numerical order.

14      Q       When you testified previously about this,

15  the incident involving insulin, what were you

16  referring to?

17      A       I received a report from a pharmacy

18  manager Kasia Osga that he was unable to calculate

19  insulin dosage.  He also kept forgetting to put

20  insulin in the refrigerator, which could put a

21  patient at risk.  It's a standard practice if we

22  have a prescription for insulin we keep it in the

23  refrigerator until the patient picks it up.

24      Q       When you talk about an insulin doseage,

25  can you simplify that for me, since I'm not a

43

1   pharmacist as to say what it is you're referring to?

2       A    If a parent -- if we get a prescription

3   that says a patient needs ten units of insulin three

4   times a day for a month, we need to be able to

5   calculate how much insulin the patient needs for a

6   month.

7       Q    Is it your testimony that that is

8   something Mr. D'Cuhna was incapable of performing?

9       A    That is an example --

10          MR. D'CUNHA:  Object to the line of

11  questioning.

12      Q    You can answer, sir.

13      A    That is an example of insulin-dosing

14  calculation.  I don't know exactly what the incident

15  was here.

16      Q    Other than those performance-related

17  problems, were there any other problems that

18  Mr. D'Cunha was having at -- in connection with his

19  training?

20      A    I guess the biggest problem we had with

21  his training was that he was not receptive to the

22  training.  I have received numerous reports, and

23  some is documented, that we would attempt to show

24  him something that he was not proficient in, and he

25  would respond angrily by saying, "You don't have to

44

1  tell me how to do this.  I understand how to do it,"

2  when in reality he did not.  Something as simple as

3  checking voice mail, checking physician voice mail.

4      Q     And was that reported to you?

5      A     It was.

6      Q     On one occasion or more than one occasion?

7      A     It was on multiple occasions.  I don't

8  know if I have that documented on multiple

9  occasions.

10     Q     But is it your recollection, as you sit

11 here today, that you were notified of that problem

12 on multiple occasions?

13     A     Yes.

14     Q     If you can go back to this document that

15 I've given you that's in front of you, C-11, page

16 33, this e-mail?

17         MR. D'CUNHA:  I can't hear you, Mr. Bucci.

18     Q     This e-mail from Kasia, can you go down

19 through the various items that are listed, and if

20 there's any that stand out to you or that you

21 haven't already discussed, if you could do so for

22 me, please.

23     A     "Patient came to the drive-through to pick

24 up her medicine" --

25     Q     You don't have to read it out loud.  If

45

1   you would just read it to yourself, just let me know

2   that there's an item that you recall as being a

3   problem with.

4        A    Number one, we had a patient that was

5   allergic to aspirin, and the physician wrote a

6   prescription for Motrin, which would have been a

7   cross-allergy, so we put a DUR exception on there

8   which we discussed before as the drug utilization

9   review exception.  Patrick came to the pharmacy

10  manager and said, "I do not know what to do with

11  this."

12            Patrick was instructed by the pharmacy

13  manager how to handle this type of problem.

14  However, Patrick did not watch the pharmacy manager

15  consult the patient.

16       Q    Okay.

17            MR. D'CUNHA:  Can you please repeat that?

18  I'm sorry.  I didn't get -- can you go over it

19  again, please?

20       A    Should I read it?

21       Q    I don't think you need to read it.

22            MR. D'CUNHA:  No.  What he just said, I

23  didn't hear that.

24            MR. BUCCI:  Well, you can ask the court

25  reporter to read it back so we can do that.

46

1    MR. D'CUNHA:  Okay.  So I request that,

2  please.

3    (Whereupon, the preceding answer is read

4  back by the reporter.)

5    Q    With respect to Number 2, sir, did you

6  talk about that already with the problem with

7  insulin?

8    A    I did.  To expand on it, the problem was

9  Patrick was asked to check an insulin dose and

10  calculate how many units are in one pen cartridge

11  and for how long it what last.  Patrick was unable

12  to calculate the insulin doseage.  He was instructed

13  by the RXM about the calculation.  And this is

14  something that's not related to Walgreens practice.

15  It's standards practice for a pharmacist.

16    Q    Number 3, did you discuss that already?

17    A    I did.

18    Q    How about Number 4, did you discuss that

19  already?

20    A    I did.

21    Q    How about Number 5, with respect to

22  Mr. D'Cunha managing his time, was that reported to

23  you to be a problem as well?

24    A    It was, yes.

25    Q    Did you receive that complaint by this one

47

1   person Kasia or from others as well?

2        A     From others as well.  I observed it

3   myself.  One, I believe it was an early morning when

4   I went to see Patrick to evaluate performance on my

5   own, and he had difficulty processes a prescription

6   for a patient.

7        Q     The next one is Number 6, the phone

8   system.  What does that refer to, sir?

9        A     We have a IVR phone system where the phone

10  calls come in and it's picked up by the voice mail,

11  and pharmacists have to simply know how to answer

12  the phone, hit the pick-up button, how to put

13  patients on hold, how to transfer between phones.

14  And apparently, they had difficulty in training him

15  how to use the phone system.  It took him two days

16  to learn where pick up and park button is.  Pick up

17  button is a button you hit when you want to pick up

18  a call.  Park is a button you press when you want to

19  put a call on hold.

20       Q     It was reported to you by his supervisor,

21  that he was -- it took him two days to learn how to

22  answer the phone and put the phone on hold.

23       A     That's correct.

24       Q     And Number 7, can you identify what that

25  is, please?

48

1     A     This is regarding patient care and drug

2   information.  It says the biggest problem at work

3   for Patrick is consulting patients.  Patient came to

4   consultation and asked, "My wife could be pregnant

5   and she's taking Celexa and some other medications

6   from your pharmacy.  I would like to know if any of

7   the medicines are contraindicated in pregnancy."

8           Patrick was unable to answer the question.

9     Q     That was reported to you as well in this

10  e-mail?

11    A     That's correct.

12    Q     Did anyone else ever discuss with you that

13  he had trouble consulting patients as part of his

14  training?

15    A     Yes.

16    Q     Who did that, who reported that to you?

17    A     Other pharmacists, interns and

18  technicians.

19    Q     If could you turn the page to Number 8 and

20  it indicates, "Patrick never solves the problem from

21  the beginning to the end.  He's unable to work by

22  himself."

23          Do you see that, sir?

24    A     I do.

25    Q     And fair to say that was reported to you

49

1   by Kasia?

2        A     It was, yes.

3        Q     Did anyone else -- did other supervisor or

4   a person training Patrick indicate that to you as

5   part of his training?

6        A     Any pharmacist or pharmacy manager that I

7   asked to report on his performance indicated the

8   same or similar comments, that he's unable to work

9   by himself.

10       Q     Number 9, did you review Number 9 as well?

11       A     They had to constantly tell Patrick to do

12  things like pick up the phone.  Otherwise, he would

13  not.

14       Q     That was reported to you by Kasia?

15       A     Yes.

16       Q     Did any other supervisor or person

17  training Mr. D'Cuhna indicate a problem of the same

18  type?

19       A     That specific problem I don't recall.

20       Q     How about Number 10, it mentions

21  transportation, him taking public transportation and

22  it affecting the work schedule.  Do you recall that

23  being an issue as raised in the e-mail?

24       A     Yes, I do.

25       Q     Did anyone else ever raise that problem

50

1  with you?

2      A    Yes, he raised that problem to me,

3  personally.

4      Q    What was the nature of that problem as

5  explained by Mr. D'Cunha?

6      A    That he couldn't always come to work the

7  times we needed him to, he couldn't always leave at

8  the times we needed him to because of public

9  transportation schedules.

10     Q    Is there in the position of pharmacist at

11 Walgreens, or in the retail industry, if you know,

12 is there a requirement that a pharmacist -- strike

13 that.

14          Should a requirement -- should a

15 pharmacist be required to be flexible with his or

16 her hours if you're worked in a retail pharmacy such

17 as Walgreens?

18     A    It is depended on the market.  In New

19 Jersey, it's primarily suburbs, and so we expect

20 pharmacists to be able to work in any location.  I

21 imagine in large cities, people don't drive, they

22 can take the subway to work but in New Jersey since

23 suburbs, we expect people to be -- to perform to

24 work in any store.

25     Q    How about with respect to time if someone

51

1   is scheduled to work until 8 o'clock and that

2   they're asked -- is it common for an employee to be

3   asked or a pharmacist to be asked to stay later than

4   8 o'clock to accommodate another person's schedule

5   or stay because of work issues?

6        A    On occasion, on occasion.

7        Q    Does Walgreens -- did Walgreens expect its

8   pharmacists be able to assist and be able to stay

9   late or move their schedule when needed?

10       A    Within reason, yes.

11       Q    If you could turn to page 36.  It's

12  another e-mail.  This one's dated September the

13  19th, 2005 from Kasia.  It is Bates stamp at the

14  bottom Walgreens-ER-36.  Do you recognize this

15  e-mail?

16       A    Yes, I do.

17       Q    Is this an e-mail you received in the

18  regular course of business from Kasia?

19       A    It is, yes.

20       Q    And can you describe what was reported to

21  you in this e-mail?

22       A    She wanted to train him personally as an

23  experienced pharmacy manager.  He, however, had a

24  problem arranging the schedule because he had issues

25  with transportation.  He asked on several occasions

52

1  to leave early or come late.

2       Q    States there, says, "I refused and told

3  him that it's not fair with the other pharmacists."

4            Do you know what she was referring to?

5       A    It means that we expect -- she, at that

6  time, had five or six or seven pharmacists working

7  for her and she had the same expectations from all

8  of her pharmacists.

9       Q    And do you know did Walgreens have

10 expectations with respect to its pharmacists in

11 scheduling and timing?

12      A    To come to work when scheduled, yes.

13      Q    And is that consistent with what the

14 companies requirements were?

15      A    Yes.

16      Q    And what else is mentioned?

17      A    She discusses here how when she tries to

18 explain something to him, for example, how to listen

19 to voice mail, we receive voice mail from patients

20 and physicians, he interrupted in the middle of my

21 sentence and said he knows what he -- he knows how

22 to do it.

23           From my observation, I know it's not true

24 because he did not give me a chance to explain.   I

25 told him in order to learn, he has to listen but he

53

1   ignored me.

2           She added he had a horrible attitude

3   toward her pharmacy interns.  He treated them with

4   disrespect and did not listen if they wanted to

5   teach him something.

6       Q    So I've asked you other questions about

7   Mr. D'Cunha's performace as it pertains to the

8   operation and medication.  Let me ask you a

9   question, because it's raised in here, about his

10  interaction is with co-employees.  Did you have --

11  is this the first time on September 19 you were ever

12  told anything about Mr. D'Cunha's attitude in

13  dealing with other employees or with people who were

14  training him?

15      A    I -- regarding his attitude, I don't

16  recall if I ever received that previously.  I was

17  told previously that a difficulty in his training is

18  that he was not receptive to training.  So we would

19  try to teach him something that he was clearly

20  deficient on and he would respond by saying, "You

21  don't need to show me that because I already know

22  how to do it."

23      Q    And do you -- many people reported that to

24  you?  When you say someone prior to Kasia.  Was it

25  one person or more than one person?

55

1      Q      Do you understand my question, sir?

2      A      I do.

3      Q      Okay.  Was a decision ever made with

4  respect to his employment?

5      A      No.  In fact, I believe we gave him

6  additional training after this.

7      Q      Okay. But at some point, was a decision

8  made; does he still work there today?

9      A      No, he does not.

10     Q      Under what circumstances does he no longer

11 work there?

12     A      He was discharged because he failed to

13 meet our minimum employment standards.

14     Q      Was that -- was the decision to discharge

15 his employment, were you involved in that decision?

16     A      I was involved in the decision.

17     Q      You and who else?

18     A      Mr. David Cohen.

19     Q      In making that decision, were you -- was

20 that decision that you made based on -- in part or

21 in whole, on what was reported to you by Kasia in

22 pages 33, 34 and 36, those e-mails that we just

23 discussed, did that factor into your decision?

24     A      It did, yes.

25     Q      What else factored into that decision to

58

1  Mr. D'Cuhna at Roselle?

2      A      He was.

3      Q      Did you have any conversations with Mr. Lu

4  other than what's contained in this written

5  communication?

6      A      I did have phone conversations that were

7  consistent with the e-mail message.

8      Q      Did you -- would you have expected

9  Mr. D'Cunha to have been properly trained and

10  capable of working as a pharmacist by the time of

11  early October, given that he had started sometime in

12  June?

13      A      I think we provided him more than enough

14  opportunities for training.

15      Q      And was it -- what was the decision with

16  respect to whether or not he was capable of

17  performing the job?

18      A      We felt that due to the fact that we've

19  trained him for so long and the pharmacists

20  evaluating him still felt he was not able to work as

21  a pharmacist, that we would not be able to

22  adequately train him.

23      Q      There's -- if you look at 38 and 39, pages

24  38 and 39, there's references to him having

25  transportation problems because of the buses.  Were

60

1    Q    It indicates that, at least as of

2 September 6, Mr. D'Cunha was being issued a final

3 written warning for his failure to report to work as

4 scheduled and his failure to be receptive to staff

5 training.

6          Are those -- do you recall that subject

7 ever being discussed between you and Mr. Cohen?

8    A    I do, yes.

9    Q    Were you involved in the decision to issue

10 a final written warning to Mr. D'Cunha?

11   A    Yes, I was.

12   Q    And are the reasons why he was being given

13 a final written warning set forth in this document?

14   A    Yes, they were.

15   Q    And it says, "The following are examples

16 of your failure to accept constructive advice from

17 other staff members and unwillingness to train," and

18 do you see that there's three listed there, sir?

19   A    Yes, I do.

20   Q    Did you and Mr. -- well, was it the belief

21 of the company that Mr. D'Cunha had committed these

22 infractions that are set forth in here?

23   A    Yes.

24   Q    It says, "In East Orange, the pharmacist

25 Oruchi Opara informed you that you had filed the

61

1  prescriptions out of order the night before and you

2  interrupted her by stating, 'Don't come to me with

3  this nonsense,' and accused her of sabotaging your

4  work.

5      A    Yes.

6      Q    Is that what was reported to you?

7      A    Yes, it was.

8      Q    And the next one says that, "In Elizabeth,

9  when instructed how to unlock the door to the

10  pharmacy, you accused Mr. Colaizzi of harassing you

11  and giving you unfair treatment."

12          Do you recall that incident?

13      A    I do.  I believe I was called to the

14  pharmacy because it was 30 minutes after the

15  pharmacy was supposed to open and Patrick was unable

16  to open -- unlock the door to enter the pharmacy.

17  At which point I went and unlocked the door.  I

18  don't recall harassing Mr. D'Cunha.

19      Q    Did you harass him?

20      A    I did not.

21      Q    Is -- the pharmacy was locked.  Was the

22  pharmacy supposed to be open?

23      A    The pharmacy was supposed to be open.  We

24  keep the pharmacy locked when the pharmacy is

25  closed.

66

1 based on his failure to fulfill minimum competency

2 requirements.

3     Q    Why did you offer him the opportunity to

4 resign?

5     A    We felt it would give him an easier

6 employment record, if you may.

7     Q    I'm going to read this, tell me if I'm

8 reading it correctly, "Based on findings by" -- why

9 don't you read it for me, sir.

10     A    "Based on findings by pharmacy "-- "RXM"

11 stands for "pharmacy manager," "Patrick is not

12 fulfilling competency requirements.  Patrick will be

13 allowed to resign or be terminated from the Walgreen

14 Company."

15     Q    And the basis for the termination was

16 what?

17     A    Was he failed to meet our minimum

18 performance standards after multiple attempts at

19 training, we felt he would not be able to meet those

20 standards.

21     Q    Did Mr -- what did Mr. D'Cunha say when --

22 at this meeting?

23     A    He refused to sign it and I believe he

24 said, "Go ahead and fire me."

25     Q    Okay.  And did you, in fact, terminate his

71

1   increase in his base rate?

2        A    It was a market increase for all

3   pharmacists.

4        Q    Did it have anything to do with his

5   performance?

6        A    No.

7        Q    What was the -- just for clarity, and I

8   have no more questions for you, sir, can you just

9   state the reason why Mr. D'Cuhna was terminated?

10       A    He was terminated because he failed to

11  meet our minimum performance standards for

12  competency and after numerous attempts at training,

13  we felt that he would not be able to meet those

14  standards.

15            MR. BUCCI:   I have no questions for you at

16  this time.   If Mr. D'Cunha has questions for you, he

17  can ask them now.

18            Mr. D'Cunha, would you like to ask any

19  questions of the witness?

20            MR. D'CUNHA:   Yes, but before that, could

21  we take a small break, please?

22            MR. BUCCI:   That's fine.

23            THE VIDEOGRAPHER:   Going off the record at

24  12:25 p.m.   This is the end of Tape 1 of the

25  deposition of John Colaizzi.

135

1  Q    As you sit here today, did anyone ever

2  said that he was capable of performing the duties of

3  his position?

4  A    Nobody did.

5  Q    Did you ask Keisha to harass Mr. D'Cunha?

6  A    No.  I asked her --

7  Q    What did you ask her to do?

8  A    I asked her to simply train him.

9  Q    Did she harass him to the best of your

10  knowledge?

11  A    To my knowledge, no.

12  Q    When it says that Mr. D'Cunha was fired

13  for substandard performance, and just so that we

14  understand what that means, does that include his

15  failure/refusal to accept training and advice?

16  A    Yes.  It was part of the decision made

17  that we would not be able to adequately train him

18  based on the experience.

19  Q    And by the experience, specifically what?

20  A    The experience of giving him four separate

21  occasions to train at multiple locations with

22  multiple people to get various opinions.

23  Q    Specifically with respect to his

24  willingness to accept training and advice from

25  supervisors, did that factor into your termination

136

1  decision?

2      A    It did.

3      Q    What specifically did you conclude about

4  Mr. D'Cunha's willingness to accept training and

5  advice from his superiors?

6      A    He was not willing to accept training.  It

7  almost felt as if he didn't want to perform at our

8  standards, for whatever reason.

9      Q    In the termination decision, did it

10 also -- was it also factored that it had been

11 reported to you that he had been rude to staff?

12         MR. D'CUNHA:  I object.  It's suggesting

13 the line of answering for the witness.

14     Q    Was that taken into consideration by you?

15     A    It was somewhat.

16     Q    There has been testimony previously about

17 his taking leaves of absence that may not have been

18 authorized.  Do you recall that?

19     A    I do recall him not showing to work on

20 occasion without anybody's knowledge.

21     Q    Did that -- was that taken into account,

22 that is did that factor into the termination

23 decision as well?

24     A    The final decision was strictly based on

25 performance.

148

C E R T I F I C A T I O N

I, JANE A. GARBUS, a Certified Court Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination,  JOHN COLAIZZI, JR., was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

*Jane A. Garbus, CSR*

—————————————————————————————————————————————
Certified Court Reporter of the State of New Jersey
Certificate No. XI01648

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14** **Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

P46.

Westlaw.

479 F.3d 193                                                                                              Page 1
479 F.3d 193, 99 Fair Empl.Prac.Cas. (BNA) 1601, 89 Empl. Prac. Dec. P 42,713
**(Cite as: 479 F.3d 193)**

◄D'Cunha v. Genovese/Eckerd Corp.
C.A.2 (N.Y.),2007.

United States Court of Appeals,Second Circuit.
Patrick F. D'CUNHA, Plaintiff-Appellant,
v.
GENOVESE/ECKERD CORPORATION,
Defendant-Appellee.
**Docket No. 04-0391-CV.**

Argued: Feb. 3, 2005.
Decided: Feb. 27, 2007.

**Background:** Job applicant brought action against
employer, alleging that failure to hire him violated
Age Discrimination in Employment Act (ADEA).
The United States District Court for the Eastern
District of New York, Frederic Block, J., 2003 WL
22937680, granted summary judgment in favor of
employer, and applicant appealed.

**Holding:** The Court of Appeals held that genuine
issue of material fact as to whether employer's
proffered nondiscriminatory reasons for not hiring
job applicant were a pretext for discrimination
precluded summary judgment.

Vacated and remanded.

West Headnotes

**[1] Civil Rights 78 ☞1203**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1203 k. Particular Cases. Most Cited
Cases
Lack of full-time jobs for which job applicant was
qualified and for which supervisor had authority to
hire new employees constituted legitimate non-
discriminatory reasons, under Age Discrimination in
Employment Act (ADEA), for employer's rejection
of job applicant's application. Age Discrimination in
Employment Act of 1967, §§ 4(a)(1), 12(a), 29
U.S.C.A. §§ 623(a)(1), 631(a).

**[2] Civil Rights 78 ☞1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or
Required in General; Elements. Most Cited Cases
Under the ADEA, the fact that one person in the
protected class has lost out to another person in the
protected class is irrelevant, so long as he has lost out
because of his age. Age Discrimination in
Employment Act of 1967, §§ 4(a)(1), 12(a), 29
U.S.C.A. §§ 623(a)(1), 631(a).

**[3] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and
Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
Genuine issue of material fact as to whether
employer's proffered nondiscriminatory reasons for
not hiring job applicant were a pretext for
discrimination precluded summary judgment in
applicant's action against employer alleging violation
of Age Discrimination in Employment Act (ADEA).
Age Discrimination in Employment Act of 1967, §§
4(a)(1), 12(a), 29 U.S.C.A. §§ 623(a)(1), 631(a).

**\*193** Patrick F. D'Cunha, Flushing, New York,
Plaintiff-Pro-Se-Appellant.
James Bucci, Esq., Spector, Gadon & Rosen, P.C.,
Philadelphia, PA, for Defendant-Appellee.

Before WALKER, HALL and GIBSON,[FN1] Circuit
Judges.

            FN1. The Honorable John R. Gibson, United
            States Court of Appeals for the Eighth
            Circuit, sitting by designation.

PER CURIAM.

Ex. 479.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

479 F.3d 193                                                                    Page 2
479 F.3d 193, 99 Fair Empl.Prac.Cas. (BNA) 1601, 89 Empl. Prac. Dec. P 42,713
**(Cite as: 479 F.3d 193)**

Plaintiff-Appellant Patrick D'Cunha, born in 1952, is a pharmacist licensed in New Jersey. Defendant-Appellee Genovese/Eckerd Corporation ("Eckerd") is the owner and operator of a chain of drug stores. In 2001, at the age of 49, D'Cunha saw a job advertisement for a pharmacist's position at Eckerd. D'Cunha applied for the job and had an initial telephone interview*194 with Jennifer Dolan, Eckerd's Pharmacy Recruiter in August, 2001. During the interview, D'Cunha told Dolan he was flexible and could work on holidays and weekends. Ms. Dolan evaluated D'Cunha according to Eckerd's structured interview questionnaire, which ranks job candidates on a numeric scale. D'Cunha's performance during the interview, combined with his skills and experience, earned him a "Total Acceptable Rating" of seven and a "Total Unacceptable Rating" of one. These scores qualified D'Cunha for employment at Eckerd.

One month later, Eckerd's district supervisor, Jimmy Tran, called D'Cunha and asked to interview him in person the next day. During the interview, Tran explained repeatedly to D'Cunha the rigors of the job and asked why D'Cunha had not become licensed as a pharmacist in New York. D'Cunha stated that he would work any shift, anywhere, including weekends.

In February 2002, D'Cunha, then 50 years old, interviewed for a second time with Tran. During the interview, D'Cunha repeated his willingness to take any shift, anywhere, including weekends. Tran informed D'Cunha about a job opening in Sussex, New Jersey. Tran erroneously told D'Cunha the "District Pharmacy Supervisor" at the Sussex store was in charge of hiring, leading D'Cunha to believe Tran was not able to extend him a job offer for the opening in Sussex. Additionally, Tran told D'Cunha the Sussex location was not accessible by public transportation and refused to give D'Cunha details of the exact location of the store, despite D'Cunha's repeated requests for that information. Tran subsequently offered pharmacist positions to two younger individuals, Arlene Stern, then aged 47, and Deanna Babeu, then aged 42. Although the job posting to which D'Cunha had responded sought entry level pharmacists, Tran stated that he offered positions to Stern and Babeu, and not D'Cunha, because D'Cunha lacked job experience. Stern, a pharmacy manager at CVS, a competitor, declined

the job offer. In March, 2002, after D'Cunha's second job interview, Tran hired Babeu for the Sussex job.

D'Cunha filed a timely age discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that Eckerd's reasons for not hiring him were pretexts for age discrimination. The EEOC determined that it was "unable to conclude that the information obtained establishes violations of the statutes" and issued a right-to-sue letter.

Thereafter, D'Cunha filed a complaint in the United States District Court for the Eastern District of New York, alleging violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34. The district court granted summary judgment to Eckerd, holding "D'Cunha's meager, unsupported allegations of age discrimination are insufficient to establish a prima facie case of age discrimination, making summary judgment appropriate." D'Cunha appealed.

### Standard of Review

We review an award of summary judgment de novo, viewing all facts and construing all ambiguities in the light most favorable to the non-moving party. Fed.R.Civ.P. 56(c); see also *Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir.2003)*. We must draw all permissible factual inferences in favor of the party opposing summary judgment. *Terry v. Ashcroft, 336 F.3d at 137*.

### Discussion

The ADEA prohibits discrimination in employment on the basis of age against persons aged 40 or older. 29 U.S.C. §§ 623(a)(1), 631(a). Claims under the *195 ADEA are governed by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Tex. Dep't Of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir.2006)*. First, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. To achieve this prima facie case, a plaintiff must show membership in the protected age

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

group, qualifications for the jobs at issue, an adverse employment action, and that the adverse action occurred under circumstances giving rise to an inference of discrimination. *Terry v. Ashcroft,* 336 F.3d at 137-38. Second, if the plaintiff succeeds in establishing a prima facie case of age discrimination, then the burden shifts to the defendant to articulate a non-discriminatory reason for the employee's rejection. Third, if the defendant meets this burden of production, the presumption drops away, *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1337 (2d Cir.1997), and the plaintiff must prove by a preponderance of the evidence that the defendant's explanations were pretextual. *Id.* at 138.

In this case, the district court failed properly to apply this burden-shifting framework. Undertaking that analysis, we conclude that there remains a genuine issue of material fact. Under the first step of *McDonnell Douglas,* we note that D'Cunha, aged 49 and 50 at the relevant times, is within the ADEA protected class. D'Cunha was also qualified for the job; a licensed pharmacist, D'Cunha met the standards of Eckerd's employability test. Moreover, D'Cunha suffered an adverse employment action; Eckerd rejected him twice, instead offering jobs to two other people. These circumstances give rise to an inference of discrimination; one of the individuals who was offered a position was eight years younger than D'Cunha. *Terry v. Ashcroft,* 336 F.3d at 137-38. This difference in age-though not large-is significant enough to support an inference in D'Cunha's favor. *Cf. Tarshis v. Riese Org.,* 211 F.3d 30, 38 (2d Cir.2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (stating that, on a motion to dismiss, an inference of discrimination may be based upon an age difference of as little as eight years).

[1][2] Under the second step of *McDonnell Douglas,* Eckerd may respond to D'Cunha's prima facie case by "articulat[ing] some legitimate, non-discriminatory reason for the employee's rejection." 411 U.S. at 802, 93 S.Ct. 1817. To this end, Eckerd asserts the job Tran offered to Stern is not comparable to the job it could have offered D'Cunha because Stern had 25 years of pharmacy managerial experience. In addition, Eckerd asserts, after D'Cunha's first interview, there were no full-time jobs available in New Jersey for which Tran had the authority to hire

new employees and, moreover, Stern and Babeu were both of such an age as to fall within the protected class. Finally, Eckerd maintains that D'Cunha only wanted full-time work near public transportation, and so Tran did not offer D'Cunha the Sussex job. One of Eckerd's assertions is not legitimate. As D'Cunha quite correctly argues, the hiring of a person within the protected age group, Babeu, instead of D'Cunha is not determinative; under the ADEA, "the fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out *because of his age.*" *196O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). But otherwise, these assertions represent legitimate non-discriminatory reasons for rejecting D'Cunha's application. Thus, Eckerd met its burden of production under step two of *McDonnell Douglas.Fisher,* 114 F.3d at 1337.

[3] Under the third step of *McDonnell Douglas,* D'Cunha bears the burden of demonstrating Eckerd's reasons were pretextual. Accordingly, D'Cunha argues that although Stern was offered a job because she had prior experience, no managerial experience was required for the job. In addition, notes D'Cunha, the record indicates that as of August 23, 2001, there were eight full-time pharmacist positions open in Tran's area. Finally, although Tran's asserted reason for not offering D'Cunha the Sussex job was that he thought Tran would not want it because it was inaccessible by public transportation, the record indicates that the Sussex store is, in fact, accessible by public transportation.

This analysis reveals that there remain genuine issues of material fact as to whether the reasons given for not hiring D'Cunha were pretextual such that a jury could reasonably find that D'Cunha suffered an adverse employment action because of his age. The district court's order granting summary judgment is therefore reversed and the case is remanded with instructions to deny Eckerd's motion for summary judgment.

### Conclusion

For the foregoing reasons, we VACATE the decision of the district court and REMAND with instructions to deny Eckerd's motion for summary judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

479 F.3d 193                                                                              Page 4
479 F.3d 193, 99 Fair Empl.Prac.Cas. (BNA) 1601, 89 Empl. Prac. Dec. P 42,713
**(Cite as: 479 F.3d 193)**


C.A.2 (N.Y.),2007.
D'Cunha v. Genovese/Eckerd Corp.
479 F.3d 193, 99 Fair Empl.Prac.Cas. (BNA) 1601,
89 Empl. Prac. Dec. P 42,713

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Exh: PS1*

*COPY*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

PATRICK F. D'CUNHA,                                    CIVIL ACTION NO.:
                                                        02-CV-4157(FB)(LB)
        Plaintiff,                          *(CRW)*

    v.

GENOVESE/ECKERD CORPORATION,                           **STIPULATION**
                                                       **NUMBER ONE**

        Defendant.
------------------------------------------------------------X

        It is hereby agreed and stipulated by the Plaintiff, Patrick F. D'Cunha ("Plaintiff"), and Defendant, Genovese/Eckerd Corporation ("Defendant"), that no party objects to the following exhibits ("Exhibits") on the grounds of authenticity.

        The Parties reserve all other objections to the Exhibits, including objections based on relevance, and the right to stipulate to the authenticity of other exhibits not set forth herein.

### Exhibits

1.    Plaintiff's Complaint. (Pl's. Exs. 1.1-1.11)[1]
      (excluding exhibits thereto)

2.    June 2001 Eckerd New Jersey Career Opportunity Mailer (Pl.'s. Ex. 4.)

3.    Eckerd Advertisement from on or about July 2001[2] Pl's. Ex. 5.)

4.    August 29, 2001 Letter from Patrick F. D'Cunha to Jimmy Tran[3] (Pl's. Ex. 1.13.)

5.    August 2, 2001 Letter from Patrick F. D'Cunha to Jennifer Dolan (Pl's. Ex. 1.12.)

---

[1] "Pl's. Ex." References are to Plaintiff's proposed trial exhibits. As of the time of this Stipulation, Defendant has not seen Plaintiff's proposed trial exhibits to verify their accuracy.
[2] Defendant agrees to stipulate to the authenticity of this advertisement to the extent that it is an Eckerd advertisement, but Defendant does not stipulate, on authenticity grounds, that the advertisement appeared in any particular newspaper or other media.
[3] Defendant stipulates, on authenticity grounds, that this is a letter of Patrick F. D'Cunha but not to Genovese Drug Store, Inc.'s or Defendant's receipt of the letter.

6.    Dolan Completed Structured Interview Questionnaire for D'Cunha  (DEF 8 –
      DEF 13)[4] (Pl's. Exs. 7.1 -7.6.)

7.    Verification of Jimmy Tran, prepared in connection with Defendant's Motion for
      Summary Judgment, dated May 26, 2003 (Pl's. Exs. 11.1 – 11.3)

8.    Verification of Jimmy Tran II, prepared in connection with Defendant's Reply in
      Support of Motion for Summary Judgment, dated Aug. 7, 2003 (Pl's. Exs.
      11.4 – 11.7.)

9.    Verification of Arleen Stern, dated April 16, 2003 (Pl's. Exs. 13.1 – 13.2.)

10.   Resume of Arleen Stern (DEF 51) (Pl's. Ex. 14.)

11.   Eckerd Stores in NY, NJ Region (District 82, District 83 and District 81)(DEF 15
      – DEF 17) (Pl's. Exs. 17.1 – 17.3).

12.   Field Recruitment Bi-Weekly Activity Reports/Pharmacist "Reason for
      Openings" Reports/Pharmacist Openings Reports-Detail (Reasons) (DEF 23 –
      DEF 31, DEF 34 – DEF 37, DEF 55) (Pl's Exs. 19.1 – 19.13.)


PATRICK F. D'CUNHA                          GENOVA, BURNS & VERNOIA

*Patrick F. D'Cunha.*                       *[signature]*
_____                     _____
Patrick F. D'Cunha, *Pro Se*                James Bucci, Esq.
137-22 Laburnum Avenue                      Attorneys for Defendant
Flushing, NY 11355                          354 Eisenhower Parkway
(718) 661-2979                              Livingston, NJ 07039
                                            (973) 533-0777
                                            Facsimile: (973) 533-1112

Dated: June 10, 2008.                       Dated: 6/12/8

2002\002\TrialDocAuthStip-6.9.08.doc

_____

[4] References with the prefix "DEF" refer to Defendant's document production.

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

PATRICK F. D'CUNHA,                                    CIVIL ACTION NO.:
                                                       02-CV-4157(FB)(LB)

      Plaintiff,

  v.

GENOVESE/ECKERD CORPORATION,                           **STIPULATION
                                                       NUMBER TWO**


      Defendant.
----------------------------------------------------------------X

      It is hereby agreed and stipulated by the Plaintiff, Patrick F. D'Cunha ("Plaintiff"), and Defendant, Genovese/Eckerd Corporation ("Defendant"), that the parties have agreed to the following Statements of Fact.

      The Parties reserve the right to stipulate to statements of facts not set forth herein.

**Statements of Facts**

1.    Nadina J. Powell was born February 9, 1974; she was hired by James Tran, District Pharmacy Supervisor for Defendant, as a weekend on-call pharmacist; and she began her employment with Defendant on April 1, 2002.

2.    Louis J. Musto was born May 8, 1943; he was hired by James Tran, District Pharmacy Supervisor for Defendant, as a pharmacist for Defendant's store located in Fair Lawn, New Jersey; and he began his employment with Defendant on December 23, 2001.

3.    Brian Baldari was born August 19, 1977; he was hired by James Tran, District Pharmacy Supervisor for Defendant, as a pharmacist for Defendant's store located in Bergenfield, New Jersey; and he began his employment with Defendant on December 17, 2001.

4.    Jessica John was born August 21, 1975; she was hired by James Tran, District Pharmacy Supervisor for Defendant, as a pharmacist for Defendant's store located in Fair Lawn, New Jersey; and she began her employment with Defendant on November 12, 2001.

5.     Michael P. Logothetis was born September 6, 1962; he was hired by James Tran, District Pharmacy Supervisor for Defendant, as a pharmacist for Defendant's store located in Fair Lawn, New Jersey; and he began his employment with Defendant on November 19, 2001.

6.     Deanna R. Babeu was born March 30, 1960; she was hired by James Tran, District Pharmacy Supervisor for Defendant, as a pharmacist for Defendant's store located in Sussex, New Jersey; and she began her employment with Defendant on March 18, 2002.

PATRICK F. D'CUNHA

Patrick F. D'Cunha, *Pro Se*
137-22 Laburnum Avenue
Flushing, NY 11355
(718) 661-2979

Dated: June 10, 2008.

2002\002\TrialStip2 6.9.08.doc

GENOVA, BURNS & VERNOIA

James Bucci, Esq.
Attorneys for Defendant
354 Eisenhower Parkway
Livingston, NJ 07039
(973) 533-0777
Facsimile: (973) 533-1112

Dated: 6/12/8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PATRICK F. D'CUNHA,                                    CIVIL ACTION NO.:
                                                       02-CV-4157(FB)(LB)
                    Plaintiff,

          v.

GENOVESE/ECKERD CORPORATION,                           **STIPULATION
                                                       NUMBER THREE**


                    Defendant.
-----------------------------------------------------------------X

          It is hereby agreed and stipulated by the Plaintiff, Patrick F. D'Cunha
("Plaintiff"), and Defendant, Genovese/Eckerd Corporation ("Defendant" or
"Eckerd"), that the parties have agreed to the following statements of fact.

          The Parties reserve the right to stipulate to statements of facts not set forth
herein.

          **Statements of Facts**

1.   Plaintiff Patrick D'Cunha, born in 1952, is a pharmacist licensed in New Jersey.

2.   Eckerd Corporation owned and operated retail pharmacy stores in various states,
     including New Jersey, Pennsylvania and New York.

3.   In or around the summer of 2001 at the age of 49, Plaintiff received a flyer in
     the mail from Eckerd regarding career opportunities as an Eckerd pharmacist in
     New Jersey.

4.   After Plaintiff received the flyer, he applied for a pharmacist position with
     Eckerd.

5.   Plaintiff initially telephoned Jennifer Dolan, Eckerd's pharmacy recruiter for the
     New York Metro Region, with whom he had an initial telephone interview on or
     about August 1, 2001.

6.  On the ratings section of the Pharmacist Structured Interview Questions form pertaining to non-experienced pharmacists, Plaintiff received a "Total Acceptable" rating of 7, a "Total Marginal" rating of 3 and a "Total Unacceptable" rating of 1.

7.  Mr. Tran, the District Pharmacy Supervisor for the New York Metro Region, met with Plaintiff on or about August 28, 2001.

8.  Plaintiff was 49 years of age in August 2001.

9.  Thereafter, Mr. Tran offered a floater pharmacist position in New Jersey to another pharmacist, Arleen Stern, then 47 years of age, who had provided a copy of her resume to Mr. Tran.

10. A floater pharmacist travels to different stores and works different shifts, based on the stores' needs.

11. Ms. Stern had 25 years of pharmacy experience, including having worked in a retail pharmacy store as a pharmacy team leader since 1984, and previously, as a pharmacist in charge for several years.

12. Ms. Stern, who was not interested in the position, was 47 years old at the time she spoke with Mr. Tran.

13. Almost six months later, on or about February 12, 2002, Plaintiff called Ms. Dolan in connection with his application to Eckerd.

14. Ms. Dolan arranged for Plaintiff to have a second meeting with Mr. Tran, whose territory by this time had expanded to include other counties in New Jersey.

15. In February 2002, Mr. Tran met with Plaintiff, who was then 50 years old, and spoke to him about his only open available position, which was in Sussex, New Jersey.

16. At that time, Mr. Tran had one opening for an entry-level pharmacist position located at a store in Sussex, New Jersey.

2

17.  Plaintiff was 50 years old in February 2002.

18.  In March 2002, Mr. Tran hired Deanna Babeu, then aged 42, for the Sussex position.

**PATRICK F. D'CUNHA**

*Patrick F. D'Cunha*

Patrick F. D'Cunha, *Pro Se*
137-22 Laburnum Avenue
Flushing, NY 11355
(718) 661-2979

Dated: June 10, 2008.

**GENOVA, BURNS & VERNOIA**

James Bucci, Esq.
Attorneys for Defendant
354 Eisenhower Parkway
Livingston, NJ 07039
(973) 533-0777
Facsimile: (973) 533-1112

Dated: 6/12/8

F:\2002\002\Trial\Stip3  6.9.08.doc

3